# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **BRIAN C. WILLIAMS, MARICOL YUNAIRA TINEO DE LEON, JAIRO VENSRIQUE LEON DA COSTA, and** others similarly situated, **PLAINTIFFS,** v. **THE ESTATES LLC, THE ESTATES (UT), LLC, THE ESTATES REAL ESTATE GROUP, LLC, TIMBRA OF NORTH CAROLINA, LLC, VERSA PROPERTIES, LLC, RED TREE HOLDINGS, LLC, MALDIVES, LLC, TONYA NEWELL, CAROLYN SOUTHER, DOES 1 – 100,** **DEFENDANTS.** | **Case No.: 19-1076** **COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS** Fed. R. Civ. P. 23 **JURY TRIAL DEMANDED** **CLASS ACTION** |

1

Plaintiffs Brian C. Williams, Maricol Yunaira Tineo De Leon, and Jairo Vensrique Leon Da Costa ("Plaintiffs") for their complaint against the Defendants allege as follows:

## SUMMARY

1.      The Estates is a membership organization (or group of membership organizations) that has engaged, and continues to engage, in a bid-rigging scheme in violation of Section 1 of the Sherman Antitrust Act (the "Sherman Act").  Persons, either individually or through companies that they create, become members of the Estates.  As members, they gain access to a database of properties facing foreclosure in North Carolina.  Members are required to enter into an agreement that only one member may bid on any given property at any particular foreclosure sale and that no member may out-bid another.   The Estates notes that this is in part to avoid "negotiating away potential income." The Estates is paid a "finders fee" for every property that a member bids on at a foreclosure sale, and bids are placed on the members' behalf by the Estates.

2.      The Plaintiffs, and other similarly situated homeowners and property owners, lost their homes and properties through the Estates' illegal bidding practices or otherwise were deprived of proceeds in excess of the foreclosed debt because when properties are sold at foreclosure auctions, the proceeds are used to pay off the mortgage and other debt attached to the property, with any remaining proceeds paid to the homeowner.

3.      Each instance of bid rigging engaged in by the Estates, its employees, contractors, and members constitutes a felony, and is a *per se* violation of the Sherman

2

Act.  The members' acts constitute a conspiracy under the Act.  Homeowners such as the Plaintiffs suffered serious harm, losing valuable equity in their homes if not their homes themselves, because of Defendants' anti-competitive behavior, which distorted the process in North Carolina foreclosure sales.  Defendants unfairly and unjustly profited from their wrongdoing.

4.      Defendants are liable to Plaintiffs for violations of Section 1 of the Sherman Act, unjust enrichment, and unfair and deceptive trade practices under North Carolina law.

## PARTIES

5.      Plaintiff Brian C. Williams ("Williams") is a citizen and resident of Durham County, North Carolina.

6.      Plaintiff Maricol Yunaira Tineo De Leon ("De Leon") is a citizen and resident of Wake County, North Carolina.

7.      Plaintiff Jairo Vensrique Leon Da Costa ("Da Costa") is a citizen and resident of Wake County, North Carolina.

8.      Defendant The Estates LLC ("Estates NC") is a North Carolina Limited Liability Company with its principal office located in Cary, North Carolina.

9.      Defendant The Estates (UT), LLC ("Estates UT") is a Utah Limited Liability Company which does business as The Estates, LLC in Utah, and is registered in North Carolina as a foreign Limited Liability Company with its principal office located in Cary, North Carolina.

10.    The Estates Real Estate Group, LLC ("Estates RE") is a Utah Limited Liability Company which does business as The Estates, LLC in Utah, and is registered in North Carolina as a foreign Limited Liability Company with its principal office located in Greensboro, North Carolina.

11.    Defendant Timbra of North Carolina, LLC ("Timbra") is a North Carolina Limited Liability Company with its principal office located in Cary, North Carolina.

12.    Defendants Estates NC, Estates UT, Estates RE and Timbra are collectively referred to in this Complaint as the "Estates Defendants."

13.    Upon information and belief, Defendant Tonya Newell ("Newell") is a citizen and resident of Wake County, North Carolina.

14.    Upon information and belief, Newell served as what the Estates Defendants call an "Acquisition Assistant" and was responsible for paying the deposits on certain of the rigged bids.

15.    Upon information and belief, Defendant Carolyn Souther ("Souther") is a citizen and resident of Union County, North Carolina.

16.    Upon information and belief, Souther is a member of the Estates and actively engaged in the bid rigging conspiracy described herein.

17.    Defendant Versa Properties, LLC ("Versa") is a North Carolina Limited Liability Company with its principal office located in Garner, North Carolina.

18.    Defendant Red Tree Holdings, LLC ("Red Tree") is a North Carolina limited liability company with its principal office in Concord, North Carolina.

4

19.     Defendant Maldives, LLC ("Maldives") is a North Carolina Limited Liability Company with is principal office located in Garner, North Carolina.

20.     Defendants Doe 1 – 100 are various conspirators in the Estates' big rigging scheme whose names will be uncovered in discovery, including:

a.  Members of the Estates, like Defendant Souther  who have entered into a bid-rigging agreement regarding foreclosures in North Carolina with the Estates and each other;

b.  Other Acquisition Assistants who, like Defendant Newell, placed anti-competitive bids on behalf of the members of the Estates;

c.  Limited liability companies that, like Defendants Versa, Maldives and Red Tree, were set up at the direction of the Estates and were the high bidders at foreclosure auctions as a result of their bid-rigging agreement with the Estates and its members;

d.  Other individuals and businesses that were involved in structuring the Estates scheme, coordinated the bid rigging, and profited from the perpetuation of the scheme.

**JURISDICTION AND VENUE**

21.     Plaintiffs institute this action under the private enforcement provisions of the Clayton Act, 15 U.S.C. §§ 15 and 16, for damages and to secure injunctive relief against Defendants for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 16.

23.     Plaintiffs further assert supplemental jurisdiction of this Court over the causes of action that arise under the laws of the State of North Carolina, particularly Unfair and Deceptive Trade Practices under Chapter 75 of the North Carolina General Statutes.

24.     Venue is proper in this Court pursuant to 15 U.S.C. §§ 22 and 26 and 28 U.S.C. § 1391(b) – (d) because the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, at least one Defendant has its principal office in this District, and at least one Plaintiff resides in this District.

## FACTS

### A.     The Estates and Bid-Rigging

25.     The Estates Defendants solicit investments from individuals and businesses across North Carolina to take part in a "system" that coordinates bidding on foreclosures in North Carolina.

26.      The Estates Defendants maintain an online database of properties facing foreclosure in North Carolina (the "Estates Database").  According to the Timbra, LLC Wholesale Buyer Licensing Agreement (the "Timbra Agreement"), Defendant Timbra provides access to the Estates Database through a contractual arrangement with Estates NC and/or Estates UT. A copy of the Timbra Agreement is attached as **Exhibit 1.**

6

27. Upon information and belief, the Estates Database provides a broad range of real estate and related information that is compiled from public information. The Estates Database includes real estate data along with the Estates Defendants' opinions on the properties, such as the potential equity in the property and potential profits from a purchase at a foreclosure sale.

28. Pursuant to the Timbra Agreement, the Estates Defendants receive the following different types of fees or compensation involved with the acquisition of any property through the Estates Database:

    a. <u>Monthly User Fee</u> – a monthly user fee of $99.97 for the first county and $50.00 per month for each additional county;

    b. <u>Acquisition Fee to Timbra</u> – Timbra receives an acquisition fee for any properties acquired from the Estates Database;

    c. <u>Profit Splits</u> – There are several profit-sharing arrangements between the Estates Defendants and the members, with "simple" transactions – defined as a simple bid with no strategy and simple offer – having a profit split of 2/3 to the Member and 1/3 to the Estates Defendants.

29. Persons who have contracted with the Estates to obtain information about properties being sold at foreclosure and who agree to bid on those properties through the Estates are referred to in this Complaint as "Members" of the Estates.

30. Members relinquish control over their ability to freely bid on foreclosure properties in exchange for being part of this scheme. The Estates Defendants and Estates

UT Manager Craig Brooksby "coach" all of the Members through the bidding and acquisition process.

31. Upon information and belief, Members are required to use real estate agents and/or brokers who are selected by the Estates. If Members want to use outside agents and/or brokers, then the Estates must approve them.

32. Upon information and belief, Members are required to use closing attorneys selected by the Estates.

33. Members of the Estates are required to establish separate companies to participate in each foreclosure sale.

34. In some cases there are companies established for the sole purpose of placing a bid and a second company to actually purchase the property.

35. Upon information and belief this fragmented structure is designed both to mask the involvement of the Estates in the transaction and to make it difficult to discovery the coordinated nature of the bidding at numerous foreclosures.

36. Carolyn Souther, a Member, has testified under oath in another proceeding that all Members enter into a non-compete agreement. A copy of relevant portions of Souther's testimony quoted in this Complaint at Paragraphs 39 to 44 is attached as **Exhibit 2.**

37. Under the terms of the Timbra Agreement, the Members are given access to multiple properties facing foreclosure.

38. However, under its agreement with its Members, the Estates prohibits more than one Member from bidding on a given foreclosure.

8

39.     Souther, in testimony given under oath in another proceeding, described the

bid-rigging process in some detail:

> Q.  Does The Estates coordinate which properties get bidded on, is that done through the database?
>
> A.  No, the database simply gives us properties.
>
> Q. What happens if three investors want to bid on a property?
>
> A. I don't know. ***If I want to bid on something, and someone else says, I want to bid, one of us needs to back down***.
>
> Q. What do you mean back down?
>
> A. I don't want to bid -- if I know somebody -- even way back, if I knew that someone wanted to buy a property and I did as well, ***I'll say no, you take this one, I'll go work on another one. So, we're not bidding against, again, my friend.***[1]
>
> …
>
> Through The Estates -- I know what you're asking. You're saying through The Estates is it -- ***So, we know if one us is bidding on a property, then the others go back for another, or we find a different property.***

Souther Deposition 57:6-22, 58:7-11.

40.     Souther also testified:

> Q. Is there any requirement if you get information on a property from The Estates database, that you tell The Estates that this is where you learned about it?
>
> A. Yeah, if I find a property through The Estates, then I am going to pay a finders fee for that, that's part of my commitment to them.
>
> Q. ***And part of your commitment is that you're not going to bid on a property with another Estates member, against another member?***

---

[1] All emphasis is added unless otherwise noted.

A. *Right.*

…

A. *I will not bid against someone else bidding on The Estates. If somebody else finds the property, I will not go in and bid against them.*

Q. *Is that something that you're prohibited from doing?*

A. *It's an agreement that we make within The Estates.*

…

A. *If I did want to bid on it, I would call that person, and I have, to say are you still interested in this particular property, in which case they might say, no, I'm not, and go for it. And I'll say okay. Or they'll say, I am. And I'll say, let me know if you decide against it.*

Souther Deposition 59:6-16, 102:12-18, 102: 21-103:2.

41.   Souther expressly testified about how bid prices were coordinated:

Q. Approximately, how many people are in The Estates that you would discuss such a bid; are going to do this, or are you not going to do this with?

A. I'm not sure I understand.

Q. Whenever you're talking about the people you're not going to bid against, are you talking about five people, ten people, 100 people?

A. There might be two interested in a property. If it's a nice property, and it looks like it would renovate and flip easily, there might be four or five people interested in that property. Everybody in the room might be interested in a property if it's a great investment.

…

Q.   You talked about just you, personally, despite whatever agreement, wouldn't bid on a property that someone else was

interested in, and ***you would talk to them about it?***

***A.   Yes.***

Q.   Was that because you didn't want to unnecessarily drive the price up for them?

A.   Nothing to do with it.

Q.   Why --

A.   If they say, like on this HOA, they say, ***I'm only willing to bid $10,000 for it, then at the point they hit the 10,000, and they're not going higher, I can call*** and say, are you still not interested.  And they'll say, no, I'm done.
        In that case I'll ask Tonya to go bid on my behalf.

Souther Deposition at 103:2-16, 108:15 – 109:5.

42.     She also testified:

Q. Do[es] [The Estates] have to approve, saying yes, no, you can go bid on this property because they cleared it in terms of the other investors?

***A.   Again, we don't cross bids.  If someone is interested in a property, I'm not going to bid against them, or will they bid against me.  That's probably within the organization.***

Souther Deposition at 99:16-23.

43.     Information regarding who is bidding can be entered into the Estates

Database so that other members can track who has and has not bid.

44.     There is constant communication about who is bidding on what property:

A.   Again, we talk a lot, so we know who is working on what properties.  That's one of the reasons for having our meetings.  ***We talk about what properties, so if someone brings up a specific property, we understand that's the one they are pursuing.***
…

11

Q. Does The Estates itself offer advice; in other words, in our opinion, a good price to bid on this property would be X?

A. Sure, we all offer advice.

Souther Deposition 58:25 – 59:5, 60:7 – 10.

45. For example, on October 4, 2017, Souther sent an email to Newell in which she expressed concern that she might not have properly indicated in the Estates database that she intended to purchase a 20307 Southshore Dr., Cornelius, NC:

> I have been working this property over a week, and just realized that I may not have hit BUY as I could not find my BUY IT email. So, I hit BUY to make sure I was in position, and it came up 2nd position. Am I in 1st AND 2nd, or is someone else ahead of me?

A copy of Souther's email is attached as **Exhibit 3.**

46. Newell responded:

> I looked on Huchens [a foreclosure law firm] website. They post there [*sic*] sales for 2 months out. *It is not listed as active sale* or coming up through end of NOV at this time. (emphasis added).

47. Souther's email demonstrates that the Estates, through its database, permits members to indicate their desire to bid, and it ranks potential bidders.

48. On two other properties, Souther emailed Newell on January 18, 2018 to indicate her interest:

> I have hit BUY on a tax sale, 42 Walter Ashe as well as a property sale on 18 Jasmine Ln. Both in Sylva.

> I need to drive both so am not ready to bid tomorrow. Both go to sale tomorrow, so will plan to upset them.

A copy of Souther's email is attached as **Exhibit 4.**

12

49.     After she investigated the sale, Souther emailed Newell to tell her "I bid 10K on jasmine thinking it was a tax sale, but will bid higher."  Souther's email is attached as **Exhibit 5.**

50.     Once it is determined which Member of the Estates will be the winning bidder on a particular piece of property, the bid deposit is paid to the Estates.

51.     Defendant Tonya Newell is, upon information and belief, one of several "Acquisition Assistants."  Newell's job is to attend foreclosure sales and place the sole bid for the Member who was chosen as the bidder for that particular property.

52.     Upon information and belief, North and South Carolina are split between three "Acquisition Assistants" – Newell, Sharon Pompey and Lynn Pinder.

53.     By having Newell and the other Acquisition Assistants place bids, the Estates ensures that its bid-rigging arrangement will be successful.

54.     Upon information and belief, both Newell and the Estates receive commissions if the bid placed by Newell is successful.

B.      <u>**The Nature of the Conspiracy**</u>

55.     All of the Defendants, including Does 1 – 100, have participated as co-conspirators of the Estates Defendants and have performed acts in furtherance of the conspiracy.  All Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they have been named in this Complaint.

56.     The Defendants entered into a contract or contracts and engaged in a combination in restraint of trade including, but not limited to, purchasing membership in

13

the Estates Defendants, paying fees to the Timbra website/database, and/or working in concert to bid (or refrain from bidding) on foreclosure properties.

**C.** **The Williams Foreclosure**

57.     Plaintiff Williams is the owner of a Townhome located at 344 Red Elm Drive, Durham, NC 27713, North Carolina (the "Williams Property").

58.     On or about August 8, 2015, the Elm Grove Townhome Association, Inc. ("Elm Grove") filed a claim of lien in Durham County District Court at 15 M 1124.

59.     On or about July 19, 2016, the substitute trustee, filed a Notice of Hearing to Foreclose Elm Grove's Claim of Lien, in Durham County Case No. 16 SP 712.

60.     After several continuances, Elm Grove sold the property in foreclosure on May 23, 2019.

61.     Defendant Versa, which was formed on May 22, 2019, the day before the foreclosure sale, was the highest bidder at the sale.  A copy of the bid is attached as **Exhibit 6.**

62.     Upon information and belief, Versa is either a Member of the Estates or was formed by a Member at the direction of the Estates for the purpose of purchasing the Williams Property at foreclosure.

63.     Upon information and belief, the Williams Property was listed in the Estates Database.

64.     Upon information and belief, Versa or the members of that LLC learned that the Williams Property was being foreclosed on and would be available for sale through the Estates Database.

65.     Upon information and belief, Versa or the members of that LLC entered into an agreement with the Estates and its other Members that only one Member could bid on the Williams Property.

66.     Upon information and belief, Versa or the members of that LLC were determined to be the Member of the Estates who was permitted to bid on the Williams Property.

67.     Upon information and belief, Versa or the members of that LLC paid the deposit for the purchase of the Williams Property to the Estates.

68.     As is indicated on **Exhibit 6**, Defendant Newell placed the bid and paid the deposit on behalf of Versa.

69.     On or about August 2, 2019 Versa purported to assign its bid to Red Tree. A copy of the assignment is attached as **Exhibit 7.**

70.     Upon information and belief, the purchase of the Williams Property by Versa, the bid placed by Newell, and the assignment to Red Tree were all acts taken pursuant to a bid-rigging scheme propounded by the Estates.

71.     Upon information and belief, Versa, Red Tree or the members of that LLC were required to pay money to Newell and the Estates for their role in the foreclosure.

**D.      Effort to extort money from Williams.**

72.     The first notice Mr. Williams received of the sale was an official-looking document, dated June 26, 2019, called "Notice to Respond," tacked to his door by Carolyn Souther, who, upon information and belief, was working on behalf of the Estates. The document recites a series of obligations that the Plaintiff does not have to the

15

high bidder at a foreclosure sale. A copy of the Notice to Respond is attached as **Exhibit 8.**

73.     Souther added a hand-written note to the bottom: "I represent the investor who recently won your home in the HOA foreclosure action. I may be able to help you stay in your home. *Please call me ASAP to avoid legal proceedings.*"

74.     In her deposition, Souther testified that she had presented similar notices to other owners of homes that Estates Members had bid on, and that she had written "something similar" on each notice.   A copy of the relevant portion of Souther's deposition is attached as **Exhibit 9.**

75.     Although she claims to "represent" the "investor," Carolyn Souther is neither a North Carolina licensed real estate broker nor a North Carolina licensed attorney. From June 26, 2019 until August 2, 2019, Carolyn Souther made several attempts by both phone calls and text messages to Williams and his family demanding $50,000 in exchange for Versa walking away from its foreclosure bid.

76.     On August 2, 2019, Red Tree Holdings LLC attached a similar document to Plaintiff Williams' door called a "Notice to Vacate Property." A copy of the Notice to Vacate is attached as **Exhibit 10.**

77.     ***At the time this "Notice" was sent to Williams, Williams was the owner of the property and had every right to live there.*** The notice falsely claimed that Williams was required to vacate his own house within ten (10) days.

78.     In an effort to create a veneer of legitimacy, the notice was signed by Stephanie Cooper, an attorney, and cites to various state and federal statutes. Not only

16

was this "Notice" not required by law – *Red Tree had no legal right to send it.* The only "right" Red Tree had at that point was a contract to pay a bid at a certain price.

79.     Upon information and belief, the purpose of this notice was to increase the pressure on Mr. Williams to pay Souther's demands by falsely making him believe that he faced immanent eviction.

80.     Souther used this false notice to increase the pressure on Williams. She ultimately negotiated her "demand" to $35,000, which she would accept in exchange for Red Tree walking away from its bid.

81.     Souther's negotiations were done in coordination with the Estates and required Defendant Estates UT Manager Craig Brooksby's approval. In the Williams negotiation, she contacted Craig Brooksby to get approval for accepting a counteroffer on $30,000. A copy of a text to Mbeja Lomotey, a principal of Defendant Maldives, discussing the negotiation and the need for the Estates' approval is attached as **Exhibit 11.**

## E.     **The DeLeon Foreclosure**

82.     Plaintiffs De Leon and Da Costa are the owners of a Townhome located at 3435 Archdale Dr. Raleigh, North Carolina (the "DeLeon Property").

83.     On or about January 31, 2017 the Edgewood Townhomes Association, Inc. ("Edgewood") filed a claim of lien in Wake County District Court at 17 M 43.

84.     On or about April 27, 2017, the substitute trustee filed a Notice of Hearing to Foreclose Edgewood's Claim of Lien on the Property in foreclosure proceeding, Durham County Case No 17 SP 1022.

17

85.     Edgewood sold the property in foreclosure May 30, 2019.

86.     Defendant Maldives was the high bidder at the sale.  A copy of Maldives' bid is attached as **Exhibit 12.**

87.     Upon information and belief, Maldives is either a Member of the Estates or was formed by a Member at the Estates' direction for the purpose of purchasing the Leon Property at foreclosure.

88.     Upon information and belief, Maldives or the members of that LLC entered into an agreement with the Estates and its other Members that only one Member could bid on the De Leon Property.

89.     Upon information and belief, Maldives or the members of that LLC were determined to be the Member of the Estates who was permitted to bid on the De Leon Property.

90.     Upon information and belief, Maldives or the members of that LLC paid the deposit for the purchase of the De Leon Property to the Estates.

91.     As is shown in **Exhibit 12,** Defendant Newell placed the bid and paid the deposit on behalf of Maldives.

92.     Upon information and belief, the purchase of the De Leon Property by Maldives and the bid placed by Newell were all acts taken pursuant to a bid-rigging scheme propounded by the Estates.

**F.      Effort to extort money from De Leon and Da Costa.**

93.     The first notice De Leon and Da Costa received of the sale was an official-looking document, dated June 26, 2019, called "Notice to Respond" tacked to their door

18

by Carolyn Souther, who, upon information and belief, was working on behalf of the Estates (the "De Leon Notice to Respond"). The document recites a series of obligations that the Plaintiff does not have to the high bidder at a foreclosure sale. A copy of the Notice to Respond is attached as **Exhibit 13.**

94.     Souther added a hand-written note to the bottom: "I represent the investor who recently won your home in the HOA foreclosure action. I may be able to help you stay in your home.  Please call me to avoid further legal proceedings."

95.     The language on the De Leon Notice to Respond is nearly identical to the language on the Williams Notice to Respond.  And, as noted earlier, Souther admitted that she had presented similar notices to other owners of homes that Estates Members had bid on.

96.     Souther made several attempts by both phone calls and text messages to De Leon and Da Costa.  In a text to their daughter, Souther demanded $80,000 in exchange for which: "My investor will then walk away giving you clear rights to the home."  A copy of the text message is attached as **Exhibit 14.**

97.     Souther was taught how to approach the Leons and other property owners and attempt to extract money from them between the bid and purchase of the property by the Estates:

> Q.   Are these meetings [of Members of the Estates] where you first learned how to approach a homeowner like the De Leons to negotiate?
>
> A.   Yes.

Q. Is that something Craig Brooksby taught you?

A. He was primary in it.

Souther Deposition 53:17-23. A copy of the relevant pages of the Souther deposition are attached as **Exhibit 15.**

## CLASS ALLEGATIONS

98. Plaintiffs repeat and re-allege every allegation above as if fully set forth herein.

99. This class action is brought by Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of all persons similarly situated (the "Class"), defined as follows:

> All persons and entities whose properties were sold through foreclosure proceedings in North Carolina at which a Member of the Estates was the high bidder and at which the Estates placed the bid deposit on their behalf.

100. Excluded from the class are Defendants and their officers and employees and the judicial officer(s) presiding over this action as well as the members of their families and staffs.

101. Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

a. *Numerosity* – Plaintiffs do not know the exact size of the Class or the identities of the Class members because such information is in the exclusive control of Defendants. Plaintiffs believe that the Class exceeds 100 individuals and companies

whose identities can be readily ascertained from Defendant's books and records. Therefore, the Class is so numerous that joinder of all members is impracticable.

b. *Commonality* – Plaintiffs' claims are based on an agreement among the Defendants to engage in bid rigging, and all of the Plaintiffs have suffered loss because of that conspiracy, which is reflected in Defendants' records. Questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to:

i. Whether Defendants engaged in the bid-rigging scheme alleged in this Complaint;

ii. The identity of the co-conspirators;

iii. The duration of the conspiracy of alleged in this Complaint;

iv. The geographic scope of the conspiracy alleged in this Complaint;

v. Whether the alleged conspiracy violated section 1 of the Sherman Act;

vi. Whether the conspirators engaged in unfair or deceptive trade practices;

vii. Whether the conspiracy was unjustly enriched by its acts; and

viii. The appropriate injunctive relief.

c. *Typicality* – The claims of the named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same conduct and suffered the same antitrust injuries..

21

d.    *Adequacy* – The named Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to the vigorous prosecution of the Class claims and have retained attorneys who are experienced and qualified to pursue this litigation.

102.    A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problem of manageability.

103.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

104.    The Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

105.    According to Estates LLC manager Craig Brooksby, looking at just the last 24 properties purchased through this scheme, $55 million was invested, with the participants netting $7.1 million.  A copy is attached as **Exhibit 16.**

106.    Based on the potential size of the class, Brooksby's representations, and Plaintiffs' own assessment of damages based on value of the properties lost and improper profits received, Plaintiffs believe that the amount in controversy exceeds $5 million.

## <u>FIRST CLAIM FOR RELIEF</u>
### (Violation of Section 1 of the Sherman Act)

107.    Plaintiffs incorporate all preceding paragraphs by reference.

108.    Beginning at a time that is not yet known to Plaintiffs, but in any case, before the events described in this Complaint, Defendants entered into a continuing agreement, combination, and conspiracy to engage in bid rigging in connection with foreclosures in North Carolina.

109.    Such agreement, combination, and conspiracy to engage in bid rigging constitutes a *per se* violation of 15 U.S.C. § 1 and is an unreasonable restraint of trade.

110.    The Defendants' contract, combination, agreement, understanding, or concerted action occurred in or affected interstate commerce. Defendants employed the interstate banking system in order to place the bids.  The Estates Database was hosted on the internet and information was sent across state lines.   Defendants Estates UT and Estates RE are Utah limited liability companies that have engaged with the co-defendants in anticompetitive conduct in North Carolina.   The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants.

111.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs lost their properties in improper "rigged" foreclosure sales.

112.    All members of the Class have been injured by Defendants' conspiracy in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Unfair and Deceptive Trades Practices)

113.    Plaintiffs incorporate all preceding paragraphs by reference.

114. N.C. Gen. Stat. § 75-1 mirrors the language of the Sherman Act, and provides, "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."

115. N.C. Gen. Stat. § 75-16 provides that if *any person* shall be injured by reason of any act or thing done by any other person, firm, or corporation in violation of the provisions of this Chapter, such person so injured shall have a right of action.

116. Plaintiffs have been injured by Defendants' bid-rigging and therefore have standing to bring this claim.

117. All Defendants were engaged in a conspiracy scheme to promote bid-rigging.

118. All Defendants actions as described in this complaint constituted unfair trade and deceptive acts or practices pursuant to N.C. Gen. Stat. § 75-1.1.

119. As a direct and proximate result of the Defendants bid rigging activities and unfair and deceptive trade practices, Plaintiffs and others similarly situated have been damaged in an amount to be proved at trial.

120. As a matter of law, Defendants are liable for treble damages pursuant to N.C. Gen. Stat. § 75-16.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

121. Plaintiffs incorporate all preceding paragraphs by reference.

122. By obtaining Plaintiffs' properties at foreclose sales pursuant to their bid rigging conspiracy, Defendants received a benefit.

123. The benefit was not given by Plaintiffs to Defendants gratuitously.

124. Because of their illegal conduct, Defendants have received Plaintiffs' properties under circumstances under which they should not have equitably received them.

125. Defendants have been unjustly enriched by their improper misappropriation of Plaintiffs' properties in an amount to be determined at trial.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Determine that the contract, combination, or conspiracy and the acts done in furtherance of it are in violation of the Sherman Act, 15 U.S.C. § 1 and Chapter 75 of the North Carolina General Statutes;

2. Pursuant to 15 U.S.C. § 26, preliminarily and permanently enjoin Defendants and their co-conspirators, including their directors, officers, employees, agents and all other persons acting or claiming to act on their behalf, from selling any property purchased at a foreclosure sale in North Carolina, from bidding at any foreclosure sale in North Carolina, and from engaging in any other contract, combination, or conspiracy having a similar purpose or effect;

3. Determine that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

4.  Award Plaintiffs and the class damages pursuant to 15 U.S.C. § 15 and interest as required by law;

5.  Award Plaintiffs and the class compensatory damages;

6.  Award Plaintiffs and the class treble damages under the Sherman Act and Chapter 75 of the North Carolina General Statutes;

7.  Award Plaintiffs and the class the cost of this suit and their reasonable attorneys' fees; and

8.  Grant to Plaintiffs and the class such other and further relief as the Court may deem just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated:  October 18, 2019

**J.C. WHITE LAW GROUP**

/s/ James C. White
James C. White, N.C. Bar # 31859
100 Europa Drive, Suite 401
Chapel Hill, NC 27517
jwhite@jcwhitelaw.com
(919) 246-4676
(919) 246-9113 fax

**BLUE LLP**

Dhamian A. Blue, N.C. Bar # 31405
Daniel T. Blue, III, N.C. Bar # 27720
205 Fayetteville Street, Suite 300
Raleigh, NC 27601
T: (919) 833-1931
F: (919) 833-809
dab@bluellp.com

*Attorneys for Plaintiffs Maricol Yunaira Tineo*
*De Leon and Jairo Vensrique Leon Da Costa*