IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BRIAN C. WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:19-CV-1076 |
| | ) | |
| THE ESTATES LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

After plaintiffs Brian Williams, Jairo da Costa and Maricol de Leon, and Mike Gustafson fell behind on their homeowners' dues, defendants involved in a bid-rigging scheme made the winning bids at public foreclosures on their homes. Following a trial, the jury found that the defendants violated state and federal antitrust laws, engaged in conduct amounting to extortion or attempted extortion, and were unjustly enriched by their illegal conduct. The jury awarded substantial damages, and the plaintiffs seek entry of final judgment and a permanent injunction.

Most of the requested permanent injunctive relief is appropriate because remedies at law are inadequate to address the plaintiffs' irreparable injuries, the relief is tailored to address the effects of the plaintiffs' antitrust injury and prevent recurring antitrust violations, and injunctive relief serves the public interest. That injunctive relief will be granted. But some of the requested permanent injunctive relief may be anticompetitive or more burdensome to the defendants than necessary and will thus be denied.

## I. Factual Findings

To decide on appropriate equitable relief, the Court must respect and apply the jury's binding factual findings. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 n.2 (4th Cir. 2021). This is not a problem; the jury's verdict was supported by substantial persuasive evidence and the defendants' evidence was weak.

### a. Jury Findings

After hearing several days of evidence, the jury returned a verdict finding that the various defendants[1] engaged in a bid-rigging conspiracy in violation of the Sherman Act and state law by agreeing to limit bids by Estates members to one Estates member per property during the time they were placing bids on the properties of the plaintiffs. Doc. 235 (Jury Verdict, Issues 1, 4, 7). To compensate the plaintiffs for injuries caused by these federal and state antitrust violations, the jury awarded $87,300 in damages to Mr. Williams, *id.* at 2; $85,000 in damages to Mr. da Costa and Ms. de Leon, *id.* at 6; and $34,900 in damages to Mr. Gustafson. *Id.* at 10.

The jury also found that some of the defendants used the pending foreclosures to attempt to extort funds from Mr. Williams and from Mr. da Costa and Ms. de Leon, *id.* (Jury Verdict, Issues 2 and 5), and to obtain an interest in Mr. Gustafson's home by

---

[1] The individual defendants are Craig Brooksby, Tonya Newell, Carolyn Souther, and Lynn Pinder, and the LLC defendants are Avirta LLC, GG Irrevocable Trust, King Family Enterprises LLC, Maldives LLC, NC Bidding-2 LLC, Red Tree Holdings LLC, The Estates (UT) LLC, The Estates LLC, The Estates Real Estate Group LLC, Timbra of North Carolina LLC, and Versa Properties LLC. While the defendants vary as to who is responsible for each plaintiff's claims, the defendants have not differentiated between and among themselves as to whether injunctive relief is appropriate. For ease of reading, they will be referenced as a group, except in the few instances where specificity is required for clarity. The defendants will be individually listed and distinguished in the permanent injunction and money judgment, consistent with the verdict.

2

misrepresenting eviction procedures to his ex-wife, Karen Gustafson. *Id.* (Jury Verdict, Issue 8). To compensate the plaintiffs for injuries caused by the defendants' attempted extortions and misrepresentations, the jury awarded $35,000 in damages to Mr. Williams, *id.* at 3; $50,000 in damages to Mr. da Costa and Ms. de Leon, *id.* at 7; and $10,000 in damages to Mr. Gustafson. *Id.* at 11.

Finally, the jury found that some of the defendants were unjustly enriched by their conduct at the expense of the plaintiffs. *Id.* (Jury Verdict, Issues 3, 6, 9). To prevent the defendants from being unjustly enriched by their misconduct, the jury awarded damages in the amount of $110,000 to Mr. Williams, *id.* at 4; $110,000 to Mr. da Costa and Ms. de Leon, *id.* at 8; and $55,000 to Mr. Gustafson. *Id.* at 12.

### b. General Findings of Fact

Based on the evidence at trial, and consistent with the jury's verdict, the Court finds the following facts by a preponderance of the evidence. *See, e.g.*, *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007). Additional factual findings will be made throughout this order as needed to address specific requests for injunctive relief.

The Estates LLC is a membership-based LLC founded by Craig Brooksby that operates across multiple states, including North Carolina. It has at least one employee in Bangladesh and contracts with agents in several states to provide various services to the Estates and its members.

The Estates requires members to pay a monthly subscription fee for access to its services. This includes exclusive access to the Estates' website,

http://www.estatestracking.com. The website features an online database providing real estate information on various properties in foreclosure or otherwise for sale as compiled from public data, including information such as estimated debt on a property, estimated value of a property, and location of a property.

Estates members submit internal bids on properties listed on the Estates' website by clicking on a "Buy It" button and disclosing the maximum amount they would pay for the property in question. Based on that information, Mr. Brooksby, the acquisition assistants retained by the Estates, or some other agent of the Estates, selects one bidder the Estates will represent in submitting bids at a public foreclosure auction or in the upset bid process. The Estates often does not choose the member offering the highest amount, instead frequently choosing a lower bid that has a better possibility of making more money for Mr. Brooksby and others or which he favors for other undisclosed reasons.

As part of their membership, Estates members receive the services of an acquisition assistant who attends the foreclosure sale and then bids on behalf of the chosen Estates member.[2] Estates members are also entitled to consultations with and advice from Mr. Brooksby, the Estates acquisition assistant, or both, about bidding strategies. If there is a later upset bid process, the acquisition assistant keeps the chosen Estates member informed and continues to make bids on his or her behalf. Only one

---

[2] On no more than a handful of occasions during the relevant time, the Estates authorized a member to attend a foreclosure sale and bid on his or her own behalf when all acquisition assistants were unavailable. There was no evidence that the authorized member bid against any other Estates member at any of these sales.

4

member of the Estates may use its services to place public bids on properties in foreclosure, and the Estates members agree not to bid against one another.

Mr. Brooksby is entitled to some of the profits obtained from any property acquired using the Estates' services. And if an Estates member acquires property found through the Estates database, he or she owes the Estates an acquisition fee, even if he or she does not use an acquisition assistant's services.

The Estates also provides educational services to its members. Mr. Brooksby teaches Estates members about real estate, including bidding strategies on foreclosed homes. At weekly meetings, Mr. Brooksby and the acquisition assistants educate Estates members on how to use the website and internal bidding system. Mr. Brooksby also discusses his methods for increasing profits on foreclosed properties.

For example, Mr. Brooksby advises Estates members who win a bid at foreclosure to approach the owner of the foreclosed home before closing on the property in an effort to make more money with less risk. Estates members frequently retain the services of other Estates members, such as defendant Carolyn Souther, to negotiate with the homeowner, though some Estates members make the effort individually. Mr. Brooksby is often available to Estates members and their agents, such as Ms. Souther, to talk through the best strategies to use during the negotiation process.

The strategies that the Estates and Mr. Brooksby recommend vary depending on the circumstances. Estates members or their agents, including Ms. Souther, sometimes misrepresent to the homeowner that they already own the foreclosed property in an effort to obtain the property at a lower price, to obtain payment in exchange for relinquishing

5

their putative interest, or to sell their putative interest back to the homeowner at an inflated price. On at least one occasion involving Ms. Gustafson, Ms. Souther threatened a homeowner in foreclosure with immediate eviction, contrary to what is allowed under state law.

## II. Money Judgment

The jury found that the defendants engaged in bid rigging in violation of the Sherman Act, 15 U.S.C. § 1, and state antitrust law, N.C. Gen. Stat. § 75-1, in answer to Issues 1, 4, and 7, and the plaintiffs are entitled to treble damages pursuant to those laws. *See* 15 U.S.C. § 15; N.C. Gen. Stat. § 75-16. Thus, for their federal and state antitrust violations, the defendants named in the verdict sheet[3] are jointly and severally liable to Mr. Williams in the amount of $261,900 ($87,300 trebled), to Mr. da Costa and Ms. de Leon jointly in the amount of $255,000 ($85,000 trebled), and to Mr. Gustafson in the amount of $104,700 ($34,900 trebled).

The Court concludes that the attempted extortion and misrepresentations by the defendants as found by the jury in answer to Issues 2, 5, and 8 are unfair and deceptive trade practices under North Carolina law. *See* N.C. Gen. Stat. § 75-1.1. Ms. Souther, acting on behalf of the Estates and other defendants, lied to Mr. Williams, Mr. da Costa, and Ms. de Leon about the status of their foreclosures, misrepresenting that another Estates member already owned their homes and attempting to extort money in exchange

---

[3] As mentioned in footnote 1, because of somewhat different facts for each plaintiff, the defendants for this and other issues are not completely identical across plaintiffs.

Case 1:19-cv-01076-CCE-JLW   Document 244   Filed 06/02/22   Page 6 of 32

for not enforcing the Estates member's non-existent rights.[4]  Ms. Souther lied to Mr.

Gustafson's ex-wife about North Carolina eviction law, repeatedly telling Ms. Gustafson

that her ex-husband and children would be evicted within days unless Ms. Gustafson sold

her half-interest in their home.  Now Mr. Gustafson owns his home with a bid-rigger, not

the mother of his children.  As required by statute, the damages awards as to Issues 2, 5,

and 8 must be trebled.  N.C. Gen. Stat. § 75-16; *see, e.g.*, *Bhatti v. Buckland*, 328 N.C.

240, 243, 400 S.E.2d 440, 442 (1991).  For the defendants' Chapter 75 violations, they

are jointly and severally liable to Mr. Williams in the amount of $105,000 ($35,000

trebled), to Mr. da Costa and Ms. de Leon jointly in the amount of $150,000 ($50,000

trebled), and to Mr. Gustafson in the amount of $30,000 ($10,000 trebled).

The plaintiffs are entitled to prejudgment interest on all compensatory damages

based on applicable state law.  *See Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 133

(4th Cir. 2015) (holding state law governs the award of prejudgment interest where state

claims come before a federal court on supplemental jurisdiction).  Pursuant to N.C. Gen.

---

[4] Extortion is wrongfully obtaining anything of value from another by threat, duress, or coercion to take illegal action.  *See, e.g.*, *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 675, 355 S.E.2d 838, 843 (1987).  At the time of Ms. Souther's misrepresentations, the foreclosure bidding process had ended and an Estates member had the right to buy the plaintiffs' property and obtain a deed from the trustee.  But the member had put up very little money, had not yet paid the purchase price, had no contractual obligation to complete the foreclosure purchase, and did not own the property.  By lying about the status of the foreclosure, the member's agent, Ms. Souther, attempted to coerce the plaintiffs to pay the Estates member to abandon his or her bid under the guise of selling the property back to them.  Estates members or their agents frequently approached homeowners after winning bids on foreclosed properties.  While some no doubt behaved ethically when negotiating with homeowners, it is a fair inference that others, with the encouragement of the defendants, had no real intention of closing on the foreclosure sale at all.  Extorting a homeowner was a safer bet than the risks associated with buying homes in foreclosure and flipping them.

Stat. § 24-5(b), "[i]n an action other than contract, any portion of a money judgment designated by the fact finder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied." Prejudgment interest on compensatory damages is mandatory under N.C. Gen. Stat. § 24-5(b). *See Beach Mart, Inc. v. L&L Wings, Inc.*, No. 11-CV-44, 2021 WL 1159656, at *6 (E.D.N.C. Mar. 26, 2021) (collecting cases). The plaintiffs brought antitrust claims under state and federal law and brought their other causes of action under state law, so prejudgment interest applies to the compensatory damages awarded by the jury as to each cause of action.

Because prejudgment interest applies only to the "portion of a money judgment designated . . . as compensatory damages," N.C. Gen. Stat. § 24-5(b), prejudgment interest does not apply to trebled damages stemming from a Chapter 75 violation. *See Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 372, 618 S.E.2d 867, 872 (2005); *Mkt. Am., Inc. v. Rossi*, 104 F. Supp. 2d 606, 608–09 (M.D.N.C. 2000), *aff'd*, 238 F.3d 413 (4th Cir. 2000) (per curiam) (unpublished); *Earls v. Forga Contracting, Inc.*, No. 19-CV-190, 2020 WL 1516813, at *8 (W.D.N.C. Mar. 30, 2020) (collecting cases). The plaintiffs acknowledge that the award of prejudgment interest should be based on the compensatory portion of the money judgment alone. Doc. 243 at 17. Thus, prejudgment interest will be applied only to the compensatory damages the jury awarded for the antitrust and unfair trade practices claims.

The defendants have not objected to the amounts the plaintiffs included in their proposed judgment or contended any damages should not be trebled. Nor have they asserted that any damages awards related to the defendants' federal and state antitrust

8

violations, Chapter 75 violations, or unjust enrichment are duplicative or overlapping as to any plaintiff. The defendants object only to the proposed award of prejudgment interest. Doc. 241 at 1–2. But their arguments are not persuasive.

First, the defendants contend that under federal antitrust law, prejudgment interest can be awarded only if a party has unnecessarily delayed litigation. *Id.* at 1; *see* 15 U.S.C. § 15(a). The Court need not decide whether those circumstances are present here. As noted *supra*, the bid-rigging claim arose under state law as well as federal law, and the other two causes of action were predicated on state law violations. State law requires prejudgment interest on compensatory damages.

Second, the defendants assert that prejudgment interest should not be awarded because the jury did not award prejudgment interest. Doc. 241 at 1. They cite no authority to support this argument, and, under North Carolina law, the court assesses prejudgment interest based on the jury's determination of compensatory damages. *See Brown v. Flowe*, 349 N.C. 520, 523, 507 S.E.2d 894, 896 (1998).

Finally, the defendants maintain that prejudgment interest is not required under N.C. Gen. Stat. § 75-1, the state antitrust law provision, and contend interest is authorized only if there is some other basis for it at law. Doc. 241 at 2. But the defendants do not address N.C. Gen. Stat. § 24-5(b) and its explicit mandate that prejudgment interest applies in any "action other than contract." *See Hamby v. Williams*, 196 N.C. App. 733, 738, 676 S.E.2d 478, 481 (2009). This encompasses the plaintiffs' state antitrust, Chapter 75, and unjust enrichment claims.

9

### III.    Section 16 of the Clayton Act and Permanent Injunctions

Section 16 of the Clayton Act, 15 U.S.C. § 26, permits courts to award equitable relief in private antitrust actions.  The law provides in relevant part that any person "shall be entitled to sue for and have injunctive relief against threatened loss or damage by a violation of the antitrust laws when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity."  *Id.* (cleaned up).  The plaintiffs seek several injunctive remedies for their antitrust injuries caused by the defendants' Sherman Act violations.

In deciding whether to grant injunctive relief under the Clayton Act, courts apply general equitable principles and require a plaintiff seeking a permanent injunction to show:  (1) an irreparable injury; (2) remedies at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, an equitable remedy is warranted; and (4) the public interest is not disserved by a permanent injunction.[5]  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Steves & Sons, Inc.*, 988 F.3d at 719 (applying the *eBay* test in an antitrust suit).  The Clayton Act "tweaks the first factor by authorizing equitable relief where a plaintiff shows a significant threat of irreparable antitrust injury, even if the injury hasn't happened yet."  *Steves & Sons, Inc.*, 988 F.3d at 705 (cleaned up).

-----

[5] In addition to the considerations set forth in *eBay,* Federal Rule of Civil Procedure 65 imposes procedural requirements.  In every order granting an injunction, the court must (1) state the reasons why the injunction issued, (2) state the injunction's terms specifically, and (3) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.  *See* Fed. R. Civ. P. 65(d)(1).

Where a cognizable danger exists that past or existing antitrust violations will continue or recur, a permanent injunction may be issued to protect the moving party and the public from the impact of future antitrust violations. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130–31 (1969) (noting 15 U.S.C. § 26 was enacted "not merely to provide private relief"); *Steves & Sons, Inc.*, 988 F.3d at 720 (stating courts may account for antitrust law's broader purpose of protecting competition when fashioning injunctive relief). A defendant's proclivity for antitrust violations is thus relevant when determining whether injunctive relief is warranted. *See Phillips v. Crown Cent. Petrol. Corp.*, 602 F.2d 616, 630 (4th Cir. 1979).

Injunctive relief to remedy antitrust violations "serve[s] . . . the high purpose of enforcing antitrust laws," and its "availability should be conditioned by the necessities of the public interest which Congress has sought to protect." *Zenith Radio Corp.*, 395 U.S. at 131 (cleaned up); *see also California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). District courts are "clothed with large discretion" to fashion injunctive relief in the face of antitrust violations to fit "the special needs of the individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (cleaned up).

Section 16 of the Clayton Act "states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek or a court may order." *Am. Stores Co.*, 495 U.S. at 281. Still, an injunctive remedy for an antitrust violation should be tailored "to cure the ill effects of the illegal conduct and assure the public freedom from its continuance." *United States v. Glaxo Grp., Ltd.*, 410 U.S. 52, 64 (1973) (cleaned up); *accord Steves & Sons, Inc.*, 988 F.3d at 720; *United States v. United Shoe Mach. Corp.*,

11

391 U.S. 244, 250 (1968) (noting injunctive relief should end illegal antitrust acts, deprive violators of the benefits of their illegal antitrust acts, and ensure they do not recur); *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (same); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1059 (6th Cir. 1984) (same). Generally, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up).

## IV.    Proposed Injunctive Relief

The plaintiffs have proposed several forms of injunctive relief. The defendants object and suggest significantly narrower relief, though in large part their objections are not supported with case law or by reason.

Most of the relief sought by the plaintiffs is appropriate because remedies at law are inadequate to address the plaintiffs' irreparable injury, the relief is tailored to address the effects of plaintiffs' antitrust injury on the plaintiffs and the public and to ensure the injury does not recur, and the injunctive relief serves the public interest in enforcing antitrust laws and maintaining the integrity of state foreclosure laws. Some of the requested relief, however, is inappropriate because it is possibly anticompetitive and broader than necessary to cure defendants' antitrust violations.

### a.    Engaging in Violations of the Sherman Act and State Antitrust Law

The plaintiffs seek a permanent injunction restraining the defendants "from engaging in or assisting others in engaging in violations" of Section 1 of the Sherman Act and N.C. Gen. Stat. § 75-1, and specifically from "agreeing to limit bids submitted at any

12

public foreclosure auction" and "organizing, operating, or taking part in any way in any organization that limit bids at public foreclosure auctions." Doc. 238-1 at 13–14.[6] The defendants have not objected to this proposed injunctive relief, Doc. 241 at 2, it is otherwise appropriate, and it will be granted.

First, the plaintiffs have proven that a permanent injunction is necessary to shield them and the public from possible recurrent antitrust violations by the defendants, constituting irreparable harm that damages cannot cure. *See Steves & Sons, Inc.*, 988 F.3d at 719 (considering the first two *eBay* factors together). A plaintiff may prove irreparable harm by demonstrating a "significant threat of injury . . . from a contemporary violation likely to continue or recur." *Zenith Radio Corp.*, 395 U.S. at 130. And, as noted *supra*, courts should consider "the high purpose of enforcing antitrust laws" when determining if injunctive relief is appropriate. *Id.* at 131.

The Estates' entire operation is designed to ensure that only one member will bid at a public foreclosure—in other words, it is designed to rig bids. Each member must disclose their intent to bid and their highest bid amount through an internal bid to the Estates, and the Estates will provide services to only one member placing bids at public foreclosure auctions. The Estates does not always choose the highest internal bidder, and it often chooses a lower bid that Mr. Brooksby expects to increase his profits. Estates members agree that they will not bid against each other at any public foreclosure auction.

---

[6] The Court addresses *infra* the plaintiffs' request to prohibit the defendants from operating http://www.estatestracking.com or any website that includes any mechanism to obtain information about how much a prospective bidder at a public foreclosure auction is willing to bid.

13

The defendants at trial admitted most of the facts necessary to show their bid-rigging scheme. They based their defense primarily on excerpts in agreements that ignored related provisions and that many witnesses testified did not reflect reality. They have continued to participate in bid rigging throughout this litigation while steadfastly refusing to acknowledge even the possibility that their conduct was illegal.

The plaintiffs have demonstrated the defendants' proclivity to violate antitrust laws. They proffered overwhelming evidence that the defendants created and operated for over five years an organizational structure and system designed to rig bids at public foreclosure sales. And in the face of that overwhelming evidence, the defendants consistently refused to acknowledge the possibility their bid-rigging system was illegal. Without injunctive relief prohibiting the defendants from rigging bids at public foreclosure auctions, competitive conditions will not be restored and there is a likelihood the defendants' anticompetitive conduct will recur.

The balance of hardships between the plaintiffs and the defendants favors this equitable relief. The defendants have not asserted any hardships stemming from this proposed injunctive relief, nor could they; there is no hardship imposed by ordering the defendants to comply with federal and state antitrust law. And not imposing the proposed injunctive relief will impose a hardship on the plaintiffs and the public, as the defendants' antitrust violations are almost certain to continue.

Finally, the public's interest is served by ordering the defendants to refrain from rigging bids at foreclosure auctions. The public has an interest in injunctive remedies

that "cure the ill effects of the illegal conduct and assure the public freedom from its continuance."  *Glaxo Grp., Ltd.*, 410 U.S. at 64 (cleaned up).

The Court will permanently restrain and enjoin the defendants from engaging in or assisting others in engaging in violations of the Sherman Act, 15 U.S.C. § 1, and N.C. Gen. Stat. § 75-1.  This includes agreeing to limit bids submitted at any public foreclosure auction or sale and organizing, operating, or taking part in any way in any organization that limits bids at public foreclosure auctions and sales.[7]

### b. Consummating Foreclosure Sales of the Williams Home and da Costa/de Leon Home

The plaintiffs seek an injunction prohibiting the defendants from taking "further action to consummate the foreclosure sales that they corrupted of the Williams Home and de Leon Home, including paying any bid amounts or accepting deeds from the foreclosure trustee." Doc. 238-1 at 15.[8]  This injunctive relief will be granted.

The plaintiffs have shown irreparable harm from the defendants' antitrust violations that damages cannot cure.  By submitting rigged bids on the plaintiffs' properties at public foreclosure auctions, an LLC defendant owned and controlled by an Estates member and aided by others in the conspiracy acquired the exclusive rights to buy the plaintiffs' interest in the real property.  The defendants Versa Properties LLC, Red

---

[7] At the defendants' suggestion, the Court will not include the phrase "including but not limited to" in the injunction, as it may not be as specific as Federal Rule of Civil Procedure 65(d) requires.

[8] The Court understands that the trustees in charge of these two foreclosure sales have held all proceedings in abeyance pending this litigation so that no defendant has yet acquired a deed.

15

Tree Holdings LLC, and Maldives LLC, possess these rights as the direct result of these antitrust violations.[9] Allowing these LLC defendants to consummate the foreclosure sales of the Williams home and da Costa/de Leon home would do nothing to "cure the ill effects" of those violations. *Glaxo Grp., Ltd.*, 410 U.S. at 64.

The nature of the plaintiffs' harm is particularly appropriate for cure by injunctive relief. Real property is "a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *SWN Prod. Co. v. Edge*, No. 15-CV-108, 2015 WL 5786739, at *5 (N.D. W. Va. Sept. 30, 2015) (cleaned up) (collecting cases). And the value to the plaintiffs of their right to continue living in their homes "is not measurable entirely in monetary terms." *Steves & Sons, Inc.*, 988 F.3d at 719 (discussing unquantifiable value in the right to continue operating multigenerational family business).

The balance of hardships between the plaintiffs and the defendants also weighs in favor of this relief. The plaintiffs will suffer serious hardship that is not easily quantifiable if they lose their homes to a bidder that obtained the rights to the plaintiffs' property by bid rigging and to the profit of others involved in the bid-rigging conspiracy. The defendants have not identified any hardship to them from relinquishing rights acquired as a direct result of violating the law.

As noted *supra*, the public has an interest in the enforcement of antitrust laws through injunctive remedies. *See Zenith Radio Corp.*, 395 U.S. at 130–31. Here, the

---

[9] The defendant Versa Properties, LLC won the rights to buy Mr. Williams' rights to his property as the high bidder at a public foreclosure sale. It then assigned those rights to the defendant Red Tree Holdings, LLC. Pls.' Trial Ex. 90.

16

public's interest will be served by requiring the defendants to forfeit rights acquired through violating federal and state antitrust laws.

The defendants object to an order prohibiting them from consummating the foreclosure sales. They contend that such an injunction would result in double recovery because the jury awarded damages that include the surplus funds the plaintiffs would have received from a completed foreclosure sale without bid rigging and the defendants' expected profits from later selling the properties. Doc. 241 at 5–6.

Unless and until the defendants satisfy the money judgment, the defendants' objection based on double recovery is hypothetical. If the defendants promptly satisfy the money judgment, they may seek relief from the permanent injunction and the Court will consider it. *See United States v. Snepp*, 897 F.2d 138, 141 (4th Cir. 1990) (noting a district court may modify a permanent injunction if warranted by a change of circumstances). Unless and until that happens, it would be wrong to allow the defendants to retain the benefit of and profit from their bid rigging at the expense of the plaintiffs.

The Court will enjoin Versa Properties and Red Tree Holdings from closing on the Williams property and Maldives from closing on the da Costa/de Leon property and will enjoin each of these LLCs from taking any action related to those properties other than abandoning their bids. The Court will also enjoin other defendants from assisting the LLC defendants in closing or taking any action other than abandoning their bids.

### c. Requiring the Reconveyance of the Deed to the Gustafson Home

The plaintiffs seek injunctive relief requiring the defendants to "take all necessary steps to reconvey the deed" to the Gustafson home that the defendants acquired by

17

misrepresenting eviction procedures to Mr. Gustafson's ex-wife, Karen Gustafson. Doc. 243 at 15. This injunctive relief is appropriate.

Just as with the Williams and da Costa/de Leon properties, a defendant LLC owned and controlled by an Estates member, NC Bidding-2 LLC, submitted a rigged bid at a public foreclosure auction and won the rights to purchase the Gustafson property. Ms. Souther, acting on behalf of NC Bidding-2 and a related entity, Carissa, LLC, misrepresented to Ms. Gustafson that her ex-husband, the plaintiff Mike Gustafson, and her children would soon be evicted from the property unless Ms. Gustafson immediately conveyed her half-interest in the home. Ms. Souther offered to buy Ms. Gustafson's interest for $10,000, and in the face of that threat, Ms. Gustafson sold her half-interest to Carissa. Pls.' Trial Ex. 104.

While Carissa is not a party, it acted in concert with at least four defendants—the Estates, Ms. Souther, NC Bidding-2, and Mr. Brooksby—as the defendants effectively concede,[10] and as the facts overwhelmingly show: Ms. Souther was acting on behalf of Carissa when she extorted Ms. Gustafson and convinced Ms. Gustafson to convey her property rights to Carissa; according to publicly available corporate records from the North Carolina Secretary of State, the manager of Carissa and the organizer of NC Bidding-2 is the same person;[11] one of the defendants' present lawyers prepared the deed

---

[10] *See* Doc. 241 at 6 (acknowledging that Ms. Gustafson's deed was "conveyed to Defendants").

[11] *See* Pls.' Trial Ex. 57 (identifying Michael Wayne Tripp as the organizer of NC Bidding-2); *Annual Report Carissa, LLC*, N.C. SEC. OF STATE,

18

from Ms. Gustafson to Carissa; and once Carissa sells its interest, it will, like all LLCs who acquire property rights as a result of their use of the Estates' services, share profits with Mr. Brooksby or one of his entities. *See* Fed. R. Civ. P. 65(d)(2) (providing that an injunctive order may bind "persons who are in active concert or participation with" the named parties, so long as the non-parties receive actual notice of the injunctive order); *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 115–16 (4th Cir. 2013) (evaluating the "acting in concert" requirement).

Now Mr. Gustafson shares property rights with Carissa, which acquired rights in his property through the defendants' bid rigging and other illegal acts it could only undertake because of the benefit it obtained from the bid rigging. As a result, Carissa can force Mr. Gustafson to sell his property at any time.[12] Without relief, the bid-riggers will profit. Allowing Carissa to retain its interest in the Gustafson property and concomitantly

---

https://www.sosnc.gov/online_services/business_registration/flow_annual_report/16325432 (last visited May 31, 2022) (identifying Michael Wayne Tripp as the member-manager of Carissa in 2022 annual report). Courts routinely take judicial notice of these kinds of facts from the North Carolina Secretary of State's records. *See, e.g.*, *Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019); *Green v. Turner*, No. 08-CV-72, 2009 WL 10681744, at *1 (E.D.N.C. Mar. 18, 2009) (Mag. J, recommended opinion), *recommendation adopted* 2009 WL 10681740 (E.D.N.C. Oct. 21, 2009); *Hubbard v. United Parcel Servs., Inc.*, No. 17-CV-634, 2019 WL 348885, at *2 n.1 (E.D.N.C. Jan. 4, 2019) (Mag. J, recommended opinion), *recommendation adopted* 2019 WL 346705 (E.D.N.C. Jan. 28, 2019).

[12] Under North Carolina law, a tenant in common may force his co-tenant in common to sell real property in circumstances that are highly likely to apply here. Specifically, "[a]ny person claiming real property as a tenant in common or joint tenant may petition to partition the property," N.C. Gen. Stat. § 46A-21(a), and this includes partition by sale. *See* § 46A-26. Partition by sale may be authorized if an actual physical partition cannot be made without substantial injury to any of the parties. *See* § 46A-75(a); *see also Ward v. Ward*, 252 N.C. App. 253, 257, 797 S.E.2d 525, 529 (2017). The Gustafson property is a single-family dwelling that cannot be divided without substantial injury to the parties.

permitting the defendants to profit from the property's acquisition would do nothing to cure the defendants' antitrust violation or eliminate its effects. *See, e.g.*, *Glaxo Grp. Ltd.*, 410 U.S. at 64. It would place Mr. Gustafson and his children—who continue to live in the home—at the mercy of a predatory LLC and end the shared ownership of property between two parents living apart but raising children together. Also, as discussed *supra*, the defendants' unlawful conduct resulted in loss of real property rights, the Gustafson home, which is a paradigmatic form of irreparable harm for which there is no adequate monetary remedy. *See SWN Prod. Co.*, 2015 WL 5786739, at *5 (collecting cases).

Mr. Gustafson will suffer serious hardship if Carissa is allowed to retain a half-interest in his home acquired as a result of the defendants' bid rigging. The defendants, on the other hand, have not identified any hardship imposed on them by the proposed injunctive relief. And the proposed injunctive relief will serve the public interest in enforcing antitrust laws by ensuring the defendants are not permitted to profit from their anticompetitive and unlawful conduct. As a side benefit to the public interest, it will discourage abuse of the foreclosure laws and other predatory behavior.

The defendants make only two arguments against this injunctive relief.[13] They repeat their double recovery argument made as to the other plaintiffs, Doc. 241 at 5, but as previously discussed that injury is hypothetical at this point. They also contend that

---

[13] The defendants have not objected to this relief because it would require action by Carissa. As they implicitly acknowledge in their briefing, *see supra* n.10, Carissa acted in concert with Ms. Souther, the Estates, and NC-Bidding 2 to obtain its interest in the property and benefitted from the bid rigging. *See* discussion *supra*.

the Court cannot direct them to return the property to Ms. Gustafson because she is not a party to this litigation. *Id.* at 6. But courts have broad equitable authority, and as already discussed, the conveyance to Ms. Gustafson is required to cure injury to Mr. Gustafson.

The Court will order the defendants and Carissa, an entity acting in concert with the defendants, to "take all necessary steps to reconvey the deed" to the Gustafson home that Carissa acquired through the defendants' bid rigging and extortion. It will order Carissa's agents, Ms. Souther and counsel for the defendants, to provide a copy of the permanent injunction to Carissa and its managers and members. And it will direct the Clerk to mail copies of the permanent injunction to the addresses of Carissa, its registered agent, and its member-manager available on the public record.[14] *See* Fed. R. Civ. P. 65(d)(2) (requiring notice to non-parties acting in concert).

### d. Operating the Website

The plaintiffs seek a permanent injunction restraining the defendants from "operating the website http://www.estatestracking.com or any other website that includes any mechanism to obtain information about how much money any prospective participant in any foreclosure auction is willing to pay for property being sold at any public foreclosure auction." Doc. 238-1 at 14. This injunctive relief will be granted. The

---

[14] According to Carissa's 2022 annual report, Carissa's registered agent is Anderson Registered Agents, Inc. and its address is 8480 Honeycutt Rd Suite 200-V88, Raleigh, NC 27615. Carissa's manager is Michael Wayne Tripp, and his address is 3225 McLeod Dr Suite 100, Las Vegas, NV 89121. *See Annual Report Carissa, LLC*, N.C. SEC. OF STATE, https://www.sosnc.gov/online_services/business_registration/flow_annual_report/16325432 (last visited May 31, 2022).

21

defendants will be prohibited from operating http://www.estatestracking.com in its current form and any other website that allows them to track bids or interest in properties.

The Estates website is the primary vehicle through which the defendants conduct their bid-rigging scheme. As noted *supra*, Estates members pay a monthly fee to access the website and its database, which they use to view properties and submit internal bids and which Mr. Brooksby and others use to evaluate and select the one Estates member allowed to bid on a foreclosed property. If an Estates member decides not to go forward, the Estates uses the website to identify other members who want to bid on the property and, if more than one, to select the bidder. As to each of the plaintiffs' homes, the defendants used the website to determine bidders and set bid amounts.

The website was the conduit for the defendants' bid rigging. In light of the central role of the website in the bid-rigging scheme, allowing the defendants to operate the existing website or any website with a similar tool to track bid information will cause irreparable harm and creates a significant threat that the defendants will continue to engage in bid rigging. *See Zenith Radio Corp.*, 395 U.S. at 130.

The balance of hardships weighs in favor of the requested relief. The defendants have not identified any hardships associated with this injunctive relief and have not objected to the proposed injunction prohibiting them from continuing to rig bids. Doc. 241 at 2. As for the plaintiffs, as discussed *supra*, the real threat of recurrent antitrust violations exists if defendants are permitted to continue operating websites that allow them to access bid information from prospective bidders in one centralized hub. Further,

22

the public interest is served by the proposed injunctive relief—it will be protected from the defendants' anticompetitive conduct.

The defendants contend that they should be allowed to continue to use and operate the http://www.estatestracking.com website if they remove the "Buy It" button and replace it with an "Interested" button that does not prompt members for bid amounts. *Id.* at 4–5. But an "Interested" button would tell Mr. Brooksby and the acquisition assistants which Estates members are interested in property and allow Mr. Brooksby and the acquisition assistants to coordinate bids and to discourage members from bidding. It would also make it easier to cover up or hide ongoing antitrust violations by, for example, only helping one Estates member place bids. It is appropriate to enjoin the Estates from operating a website that allows it to centrally track which members are interested in properties or the price any member is willing to pay.

To the extent the plaintiffs ask for an injunction prohibiting the Estates from operating any website at all, the request will be denied. While shutting down the website as it is currently used is appropriate, prohibiting the Estates from operating any website at all removes a possible mechanism for increased competition. One of the functions of the website is to collect and provide information in one location to members about properties for sale. The evidence showed that methods of accessing much of that information in county courthouses required personal visits and there were often different procedures to obtain information in different counties. A large database with centralized information on homes in foreclosure could make it easier for potential buyers to learn of properties available in foreclosure and thus could increase the number of prospective bidders who

23

might compete to buy the property. Posting information about properties on a website, in isolation, does not inherently lead to bid rigging, and it may well be that the Estates can provide these services without violating the antitrust laws.

### e. Prohibiting Contact with Owners Until the Foreclosure is Complete and the Trustee's Deed is Recorded

The defendants suggest it would be appropriate to require injunctive relief prohibiting "The Estates, its parent and subsidiary entities and any other entity formed by The Estates for bidding, its principals, partners, equity members, members, managers, employees and agents" from "contacting, approaching, or soliciting any property owner during the bidding process until the property deed has been recorded in the respective county and all rights as the property owner have vested." Doc. 241 at 6. This injunctive relief will be imposed as to the defendants and their agents.

After Estates members submitted rigged bids and won at public foreclosure auctions, Mr. Brooksby encouraged them to approach homeowners and negotiate a deal outside the foreclosure process. While in theory there may not be anything inherently illegal about this standing alone, in practice it was a by-product of the bid-rigging scheme and it was predatory and misleading, as the events surrounding the foreclosures of the plaintiffs show. *See supra* at 6–7. It also resulted in an abuse of the foreclosure laws, as demonstrated by the testimony of Diana Coada, trustee for Mr. Gustafson's homeowner's association. *See* Pls.' Trial Ex. 106.

The defendants engaged in a routine practice of using rigged bids to attempt to extort homeowners into selling their interest in property or paying the bidders to

24

relinquish rights in property the bidders did not actually have and had not paid to obtain.[15] The plaintiffs have shown irreparable harm because there is a significant likelihood the conduct will continue unless the defendants and their representatives are restrained from engaging in these unlawful and unscrupulous tactics.

The balance of hardships between the plaintiffs and defendants also favors injunctive relief. The defendants can hardly claim hardship in injunctive relief they suggested. As for the plaintiffs, there is no hardship imposed on them from prohibiting the defendants and their representatives from taking action likely to encourage ongoing misrepresentations, attempted extortion, and extortion. Also, the public interest is served by this proposed injunctive relief, which discourages the bid rigging that resulted in these homeowner contacts, protects other homeowners in foreclosure, and promotes the integrity of the foreclosure laws. The Court will prohibit all defendants and their representatives and agents from engaging in or encouraging this conduct.

### f. Educational, Instructional, or Consulting Services about Bidding or Purchasing Properties in Foreclosure

The plaintiffs seek a permanent injunction preventing the individual defendants from offering educational, instructional, or consulting services about bidding or purchasing properties through public real estate foreclosures. Doc. 238-1 at 14. The defendants have not objected to this injunctive relief, and it will be granted.

---

[15] The evidence and statutes establish that the high bidder has a right to obtain a trustee's deed upon timely payment of the bid amount, but no defendant had paid that amount or obtained a deed at the time their agent represented to the plaintiffs that the foreclosure was complete.

Case 1:19-cv-01076-CCE-JLW   Document 244   Filed 06/02/22   Page 25 of 32

Mr. Brooksby founded the Estates and created a membership-based organization whose very operation revolved around bid rigging. The educational and consulting services he offers were and are a core part of the scheme. Mr. Brooksby held weekly meetings in which he shared bidding strategies and provided education; during those sessions he told Estates members not to bid against one another. Ms. Souther and the acquisition assistants, Ms. Newell and Ms. Pinder, attended almost all of these meetings and contributed to the educational process. Ms. Newell and Ms. Pinder only represented one Estates member in the bidding process. The defendants consulted with the winning internal bidder and discouraged high bids of which they did not approve and that would yield less profit for the Estates and Mr. Brooksby. And once an Estates member won a rigged bid, Mr. Brooksby encouraged them to approach homeowners and negotiate a deal outside the foreclosure process in a predatory and misleading fashion.

Allowing Mr. Brooksby, Ms. Pinder, Ms. Souther, or Ms. Newell to continue offering educational and consultation services about bidding or purchasing properties in foreclosure carries a significant risk of recurrent antitrust violations. Bearing in mind the broader purpose of antitrust injunctive relief is to restore competitive conditions, the plaintiffs have demonstrated irreparable harm for which monetary damages are an inadequate remedy.

The balance of hardships on the plaintiffs and the defendants also favors injunctive relief. The defendants have not identified any hardship stemming from the proposed relief that would outweigh the resultant hardships if the defendants are not restrained from educating others on how to rig bids and extort homeowners. The public will benefit

26

from the injunction because it will be protected from the significant threat of recurrent antitrust violations and the resulting loss of competition.

The defendants' educational and consulting services revolve around bid rigging. In the face of flagrant anticompetitive conduct, the plaintiffs' proposed injunctive relief is appropriate.

### g. Prohibiting Defendants from Bidding at Foreclosure Auctions and Buying or Selling Properties Obtained at Foreclosure Auctions

The plaintiffs propose two forms of injunctive relief that prohibit Mr. Brooksby, Ms. Souther, Ms. Pinder, and Ms. Newell from participating in the public foreclosure market. First, the plaintiffs seek to restrain the individual defendants from bidding through any entity in which they have any ownership or management interest at a public foreclosure auction in the United States for the next eight years. Doc. 238-1 at 14. Second, the plaintiffs seek to restrain the individual defendants from buying or selling any property obtained through a foreclosure auction in the United States for the next eight years. *Id.* Because both forms of injunctive relief are broader than necessary to provide complete relief to the plaintiffs and will have potentially anticompetitive effects, the injunctive relief will be denied.

Injunctive relief to remedy antitrust violations should be tailored to terminate the illegal antitrust acts, ensure they do not recur, and eliminate their consequences. *See Paschall*, 695 F.2d at 335; *Microsoft Corp.*, 253 F.3d at 103, 107. But here, the proposed injunctive relief itself has the potential to disserve the public interest by removing potential participants in the public foreclosure market. *See Ford Motor Co.*, 405 U.S. at

573 (noting "[t]he relief in an antitrust case must be effective . . . to restore competition") (cleaned up). The proposed injunctive relief does not target the defendants' ability to rig bids, their methods for rigging bids, or their ill-gotten gains from the bid-rigging operation. The problem was not that the defendants were bidding or buying and selling properties; it was that they coordinated and limited bids.

Mr. Brooksby and Ms. Souther are experienced buyers and sellers of real estate. Prohibiting them from individually participating in the public foreclosure market, either alone or with their spouses or wholly-owned entities, is likely to reduce competition and is broader injunctive relief than necessary. And Ms. Newell and Ms. Pinder do not appear to be active buyers themselves, making an injunction against them of little value. Moreover, this relief is unnecessary in view of the comprehensive injunctive relief the Court will otherwise order.

The plaintiffs contend that the proposed relief is appropriately narrow because of the deliberateness and seriousness of the defendants' bid rigging. Doc. 243 at 13–14. But the plaintiffs have not addressed the potential anticompetitive impact of removing the defendants as individual participants in the public foreclosure auction market. Injunctive relief in the context of antitrust violations should be tailored to restore competition in the marketplace, not potentially remove it. *See Ford Motor Co.*, 405 U.S. at 573.

With that said, prohibiting the individual defendants from acting together or with any unrelated person or entity to bid at public foreclosures or buy and sell any property obtained at public foreclosures for the next eight years is appropriate. Just like some of

Case 1:19-cv-01076-CCE-JLW   Document 244   Filed 06/02/22   Page 28 of 32

the other forms of relief the Court is granting, this is little more than a prohibition on the specific kinds of bid rigging practiced by the defendants.

As discussed *supra*, Mr. Brooksby, Ms. Souther, Ms. Pinder, and Ms. Newell each played integral roles in the bid-rigging scheme and worked collectively to further its aims. Ms. Souther routinely used the Estates' services and coordinated bidding and negotiating strategies with Mr. Brooksby. All four educated Estates members on the Estates' bid-rigging system. Together, Mr. Brooksby, Ms. Pinder, and Ms. Newell coordinated rigged bids. If an Estates member acquired rights to purchase property through bid rigging, Ms. Souther would sometimes misrepresent those rights to homeowners to extort money from them, which benefitted Mr. Brooksby. If an Estates member closed on the property and made money, Mr. Brooksby and the others would profit; it seems that Mr. Brooksby often chose a low bid for the Estates to pursue based on how much money he personally could make, with no risk, either directly or through one of his shadow entities. Allowing the defendants to individually participate in the public foreclosure market enhances competition; but not restraining them from acting together or with any unrelated person or entity to place or close on such bids creates a significant risk of recurrent antitrust violations.

Given this significant risk of recurrent violations, injunctive relief restraining Mr. Brooksby, Ms. Souther, Ms. Pinder, and Ms. Newell from acting together with each other or with any unrelated person or entity to bid on properties at public foreclosure auctions or to buy or sell properties obtained at foreclosure auctions will be granted. The plaintiffs have shown irreparable harm from the threat of recurrent violations and will suffer

hardship if the injunctive relief is not granted. And the public's interest will be served by the injunctive relief because it will protect competition. Any hardship to the defendants is mitigated because the injunctive relief targets their ability to engage in bid rigging without prohibiting them from participating individually in the public foreclosure market.

### h. Dissolution of the Corporate Defendants

The plaintiffs seek to have the Estates LLC, the Estates (UT) LLC, and Timbra of North Carolina LLC "immediately dissolved and cease all business operations." Doc. 243-1 at 14. The defendants object to such broad relief. Doc. 241 at 4. Because dissolution is a drastic remedy that may be broader than necessary to ensure the defendants' antitrust violations do not recur, the plaintiffs' request for dissolution of those corporate defendants will be denied.

Dissolution is an extreme remedy. *See Am. Stores Co.*, 495 U.S. at 290–92 (describing how dissolution as a "corporate death sentence" is a potent remedy); *United Shoe Mach. Corp.*, 391 U.S. at 250–51 (referring to immediate dissolution as a "drastic" remedy). If the LLC defendants can operate without bid rigging, then dissolution is not appropriate.

As discussed *supra*, the Estates may be able to continue the part of its operations that provides a central clearinghouse of information about real estate in foreclosure and otherwise for sale across a broad geographic area. Such a website could have pro-competitive effects. It might also be possible for the Estates to serve as a clearinghouse for members interested in retaining the services of independent bidding assistants to physically handle the bidding at public foreclosure auctions. So long as those acquisition

30

assistants served as agents for the members and did not coordinate or limit bids between and among themselves or in conjunction with the Estates or others, such services could increase bidding and competition on foreclosed properties.

In addition to being drastic, dissolution of the LLC defendants may not be all that effective. Nothing would prohibit the defendants from forming new entities that could provide a foundation for a bid-rigging scheme if they were of a mind to violate other provisions of the permanent injunction.

The plaintiffs point out, accurately, that the very reason for the existence of these LLCs as they have operated for years was and is to "provide a platform that allows the bid-rigging scheme to prosper." Doc. 243 at 7. But given the other injunctive relief the Court is ordering, including the requirements that the defendants stop operating the http://www.estatestracking.com website or any other website that centrally tracks internal bids or interest in properties and prohibiting the defendants from engaging in bid-rigging, complete dissolution is too broad a remedy.

## V. Conclusion

For the most part, the plaintiffs' proposed injunctive relief is appropriate and will be granted. Prohibiting the defendants from continuing to operate the core aspects of their bid-rigging scheme will terminate the defendants' illegal antitrust acts, ensure their antitrust violations do not recur, and serve the public's broader interest in protecting competition. As for the injunctive relief aimed at the defendants' ill-gotten gains, injunctive relief is appropriate to eliminate the consequences of the defendants' unlawful conduct. Still, injunctive relief is not to be unlimited in scope, and some of the proposed

31

relief is broader than necessary to complete relief to the plaintiffs and is potentially anticompetitive. That injunctive relief will be denied.

For the reasons set forth above, the plaintiffs' request for permanent injunction, Doc. 238, will be **GRANTED in part** and **DENIED in part**. The permanent injunction will issue separately.

This the 2nd day of June, 2022.

_____
UNITED STATES DISTRICT JUDGE