IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BRIAN C. WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:19-CV-1076 |
| | ) | |
| THE ESTATES LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Catherine C. Eagles, District Judge.

After a trial, the jury found that the defendants had engaged in a bid-rigging conspiracy to limit competition and reduce prices paid for real estate in foreclosure. Judgment of over one million dollars was entered against the defendants and in favor of the plaintiffs. By permanent injunction, the defendant Craig Brooksby and others were prohibited from participating with any other person or entity in the sale of property obtained in public foreclosure auctions. The defendants have not satisfied the judgment and Mr. Brooksby has violated the permanent injunction by actively participating with others in the sale of pieces of real property bought at public foreclosure auctions.

The plaintiffs seek appointment of a receiver to gather and protect the assets of defendant Craig Brooksby, The Estates, LLC, Avirta LLC, GG Irrevocable Trust, and King Family Holdings, LLC. Doc. 316. In view of the overwhelming evidence that these defendants are hiding assets, and in light of the defendants' consent to the appointment of a Receiver at a hearing on November 29, 2022, the motion was granted in

open court and an Order appointing a Receiver has been entered. *See* Doc. 362. This Order memorializes the Court's findings and conclusions leading to that appointment.

The plaintiffs have also filed a motion to hold Mr. Brooksby in contempt for violating the permanent injunction and the charging orders. Doc. 329. In view of the violation by Mr. Brooksby and the modified relief sought by the plaintiffs at the present time, the motion will be granted in part and otherwise denied without prejudice.

## I. Findings of Fact

The Court finds the following based on the evidence of record and at trial.[1] Additional findings of fact are made *infra* in the Discussion section.

### A. The Bid-Rigging Scheme and the Defendants' Operations[2]

The Estates LLC is a membership-based limited liability company founded by Craig Brooksby that operates across multiple states, including North Carolina. Doc. 244 at 3. Mr. Brooksby manages and runs the Estates. He uses a number of other LLCs to conduct real estate deals and distribute profits, including defendants Avirta, Doc. 172 at 135[3] (testimony by Mr. Brooksby characterizing Avirta as "one of my LLCs"), and King

---

[1] While the Court has included some citations to the record, it has not attempted to cite all of the evidence which supports its findings of fact. Among the sources available and considered are the evidence submitted at summary judgment, class certification, and on post-trial motions, trial testimony the Court remembers, and trial exhibits.

[2] For simplicity, the Court will not repeat the facts that underlie the extortion verdicts. Suffice it to say, those facts were compelling as to the shady and deceptive conduct of the responsible defendants, including Mr. Brooksby and the Estates.

[3] The Court has used the pagination appended by the CM-ECF system for this and other deposition cites, not the internal pagination used by the court reporters transcribing the deposition.

2

Family Enterprises. *See infra* pages 6–7. Family partnerships and trusts like defendant GG Irrevocable Trust are also part of the way he distributes profits.

The Estates required members to pay a monthly subscription fee for access to its services. Doc. 244 at 3. This included exclusive access to the Estates' website, http://www.estatestracking.com. *Id.* at 3–4. The website featured an online database providing real estate information on various properties in foreclosure or otherwise for sale, including information such as estimated debt on a property, estimated value of a property, and location of a property. *Id.* at 4.

Estates members submitted internal bids on properties listed on the Estates' website by clicking on a "Buy It" button and disclosing the maximum amount they would pay for the property in question. *Id.* Based on that information, Mr. Brooksby, the acquisition assistants retained by the Estates, or some other agent of the Estates selected one bidder the Estates would represent in submitting bids at a public foreclosure auction or in the upset bid process. *Id.* The Estates often did not choose the member offering the highest amount, instead frequently choosing a lower bid that had a better possibility of making more money for Mr. Brooksby and others or which he favored for other undisclosed reasons. *Id.*

Estates members were required to use their own individual "bidding LLC"—an LLC set up with the specific intent of bidding on properties—to bid on properties. Doc. 172 at 119–21; Doc. 354-1, Interrogatory No. 6 (listing 120 "bidding llc[s]"). And as part of their membership, Estates members received the services of an acquisition assistant who was made manager of the bidding LLC and then attended the foreclosure

3

sale and bid on behalf of the bidding LLC. Doc. 172 at 120–21; Doc. 244 at 4. Estates members were also entitled to consultations with and advice from Mr. Brooksby, the Estates' acquisition assistants, or both, about bidding strategies. Doc. 244 at 4. If there was a later upset bid process, the acquisition assistant kept the chosen Estates member informed and continued to make bids on his or her behalf, through the bidding LLC. *Id.*

Only one member of the Estates could use its services to place public bids on properties in foreclosure, and the Estates members agreed not to bid against one another. *Id.* at 4–5. If an Estates member acquired property found through the Estates' database, he or she owed the Estates an acquisition fee, even if he or she did not use an acquisition assistant's services. *Id.* at 5; Doc. 172 at 122.

Mr. Brooksby was entitled to some of the profits obtained from selling any property acquired using the Estates' services. Doc. 244 at 5. The exact arrangements for paying Mr. Brooksby are complicated and opaque. Mr. Brooksby and Estates members used multiple limited liability companies for the real estate transactions. *See* Doc. 172 at 84–87, 222, 231; Doc. 248-1; Doc. 354-1, Interrogatory No. 5 (Mr. Brooksby's interrogatory response identifying over 125 LLCs in which he has an interest), Interrogatory No. 6 (listing 120 bidding LLCs). Mr. Brooksby has cloaked the distribution of funds, fees, and profits through multiple LLCs and other entities, including a limited partnership and trust. *See* Doc. 172 at 84–87, 221–24, 231. These entities are often managers or members of the other entities, creating a complicated web. *See, e.g.*, Doc. 256-2 (showing that King Family Enterprises, LLC, is managed by Citadel Management LLC and its members are Rex King Limited Partnership and GG

4

Irrevocable Trust); Doc. 248-2 (showing that King Family Enterprises, LLC, is a member of Avirta LLC); 256-3 (showing that Citadel Management LLC is managed by Craig Brooksby and Rex King); Doc. 256-5 (showing that Avirta LLC is managed by Citadel Management LLC and Rex King and its member is King Family Enterprises LLC); Doc. 248-1 (showing that Avirta LLC is a member of The Estates, LLC, The Estates Real Estate Group LLC, Citadel Management LLC, Citadel Management of North Carolina, LLC, as well as several other LLCs); Doc. 354-1, Interrogatory No. 5 (showing some of the relationships between over 125 different LLCs that Mr. Brooksby was involved with or had an economic interest in). Because of this, and the sheer number of LLCs involved in this scheme, the Court is not sure exactly where the profits ended up or how much money ended up under Mr. Brooksby's control.

The mechanics of selling property through the Estates are also complicated, and difficult to ascertain with specificity. Generally speaking, and based on the record in this case, when an Estates member bought a property out of foreclosure, they would assign title to the property to another LLC, called an "equity share" LLC. *See* Doc. 172 at 177–178, 220–221. The Estates member who bought the property was the member of this equity share LLC. *Id.* at 220–21. There were typically other investors or lenders involved in financing the purchase and any renovations or other expenses. And the buyer, the lender, and one of Mr. Brooksby's LLCs each had what Mr. Brooksby characterized as an "equity share" in the property. *See, e.g.*, *id.* at 105; *see also id.* at 221 (characterizing each entity as an "economic interest holder"). Avirta, LLC, which Mr. Brooksby controls, was a member of or took an equity share interest in many of these

5

LLCs. *Id.* at 222 (testimony that Avirta "ha[d] many LLCs that t[ook] an equity share interest" in these properties). At the time of Mr. Brooksby's deposition, he estimated that there were 80 to 100 such LLCs in existence, which were often used more than once. *Id.* at 231; *see also* Doc. 322 at 2–3; Doc. 354-1, Interrogatory No. 5 (listing over 125 LLCs in which Mr. Brooksby has an interest); Doc. 354 at 17 ("[T]here are over 100 entities that are involved here which means that there are probably thousands of transactions . . . .").

When a property was later flipped at a profit, the equity share LLC distributed those profits to the Estates member, the lender, and the Brooksby/Avirta-controlled LLC. *See e.g.*, Doc. 172 at 224, 229–30. The Estates also took a fee. *Id.* at 224, 226. The Estates or the Brooksby/Avirta-controlled LLC took somewhere between 40–50% of the profits. *Id.* at 112, 224.

Mr. Brooksby received payments from the Estates for his role facilitating these transactions. *Id.* at 231. Although the transactions are difficult to follow, it seems as though the money that goes to the Brooksby/Avirta-controlled LLC also often eventually ends up under Mr. Brooksby's control through GG Irrevocable Trust and King Family Enterprises LLC or perhaps other entities. GG Irrevocable Trust and King Family Enterprises LLC are in the line of distributions that eventually make their way to Mr. Brooksby, or for his benefit. *See, e.g.*, *id.* at 85–87 (testimony about an "irrevocable trust" and "family limited partnership"); Docs. 252-2, 252-3, 252-4 (showing Rex King Limited Partnership and GG Irrevocable Trust as members of King Family Enterprises LLC); Doc 172 at 71 (Mr. Brooksby's testimony that Rex King is his brother-in-law);

6

Doc. 252-1 at 1–3 (showing Mr. Brooksby as trustee and as one of the beneficiaries of GG Trust who may receive payments from the trustee, and who has "the power to terminate the trust with respect to their own interest" and receive a distribution).

Whatever the technicalities, the reality is that Mr. Brooksby played a large role in the bid-rigging scheme and controls many of the entities that profited or that control the profits. *See, e.g.*, Doc. 299 at 11 (the defendants' brief noting that although Frosty Properties LLC owned a certain property and someone else owned that LLC, it was Mr. Brooksby who "ran the sale [of that property] from start to finish. He controlled the process. . . This has been the practice for years"); Doc. 299-1 at 6–7; Doc. 354-1, Interrogatories No. 5, No. 12. And to the extent that money from the scheme ended up in GG Irrevocable Trust, Mr. Brooksby directly profits as a beneficiary of the Trust, and he has the power to terminate the trust with respect to his own interest at any time. Doc. 252-1 at 1–3.

### B. The Trial, Judgment, Injunctive Relief, and Charging Orders

After hearing several days of evidence, the jury returned a verdict finding that the various defendants engaged in a bid-rigging conspiracy in violation of the Sherman Act and state law by agreeing to limit bids by Estates members to one Estates member per property during the time they were placing bids on the plaintiffs' properties. Doc. 235 (Jury Verdict, Issues 1, 4, 7). To compensate the plaintiffs for injuries caused by these federal and state antitrust violations, the jury awarded $87,300 in damages to Mr. Williams, *id.* at 2, $85,000 in damages to Mr. da Costa and Ms. de Leon, *id.* at 6, and $34,900 in damages to Mr. Gustafson. *Id.* at 10.

7

The jury also found that the defendants engaged in extortion and/or unfair and deceptive trade practices. *Id.* (Jury Verdict, Issues 2, 5, and 8). To compensate the plaintiffs for injuries caused by the defendants' attempted extortions and misrepresentations, the jury awarded $35,000 in damages to Mr. Williams, *id.* at 3, $50,000 in damages to Mr. da Costa and Ms. de Leon, *id.* at 7, and $10,000 in damages to Mr. Gustafson. *Id.* at 11.

Finally, the jury found that some of the defendants were unjustly enriched by their conduct at the expense of the plaintiffs. *Id.* (Jury Verdict, Issues 3, 6, 9). To prevent the defendants from being unjustly enriched by their misconduct, the jury awarded damages in the amount of $110,000 to Mr. Williams, *id.* at 4, $110,000 to Mr. da Costa and Ms. de Leon, *id.* at 8, and $55,000 to Mr. Gustafson. *Id.* at 12.

On June 2, 2022, the Court entered judgment in favor of the plaintiffs and against the relevant defendants. Doc. 245. With trebling and prejudgment interest, the judgment against Mr. Brooksby and the Estates totaled approximately $1,287,675, and GG Irrevocable Trust, Avirta, and King Enterprises are jointly liable for approximately $659,766 of that based on their participation in the bid-rigging. Doc. 245.

That same day, the Court also entered a permanent injunction, Doc. 246, after finding that there was a cognizable danger that existing antitrust violations would continue to recur and that a permanent injunction was appropriate to protect the public from the impact of future antitrust violations. Doc. 244 at 13–14, 22, 26–27, 29–30. Among other things, the defendants were enjoined from operating the Estates website in its current form or any website that allowed sharing of information about bidding. Doc.

246 at ¶ 5. Mr. Brooksby and other individual defendants were prohibited from acting with any other person or entity to buy or sell property obtained through a public real estate foreclosure auction for eight years. *Id.* at ¶ 9.

On August 10, 2022, the Court entered a charging order to multiple limited liability companies in which defendants Avirta LLC, King Family Enterprises LLC, and GG Irrevocable Trust have economic interests. Doc. 293.[4] A "charging order" is a court order that directs a limited liability company in which a judgment debtor has an economic interest to pay any money the LLC would otherwise pay the judgment debtor toward satisfaction of the judgment. *See generally* Doc. 292; N.C. Gen. Stat. § 57D-5-03; *First Bank v. S & R Grandview, LLC*, 232 N.C. App. 544, 548–49, 755 S.E.2d 393, 396 (2014).

No defendant has paid anything towards satisfaction of the judgment.

### C. Defendants' Post-Judgment Conduct & Plaintiffs' Motions

Since the filing of the permanent injunction on June 2, 2022, Mr. Brooksby has continued to participate with others in the sale of properties bought at public foreclosure auctions. For example, on June 28, 2022, he signed various documents for the sale of real estate in South Carolina on behalf of Biscay, LLC. Doc. 277-5 at 5–6, 8. This property was bought at a public foreclosure auction, Doc. 277 at ¶ 9, and the closing

---

[4] The plaintiffs also asked for charging orders as to Mr. Brooksby's purported interest in The Estates, LLC, Timbra, LLC, Avirta, LLC, King Family Enterprises, and 80 to 100 "equity share" LLCs that were assigned title to properties purchased through the Estates' bid-rigging scheme. Doc. 248 at 5–8. The Court denied this request, finding that the plaintiffs had not shown that Mr. Brooksby was an interest owner in those LLCs, as that term is used in the relevant statute. Doc. 292 at 9–12.

9

documents themselves show that Mr. Brooksby acted with another entity, Biscay LLC, to sell real estate. Mr. Brooksby has admitted his acts in the Biscay sale, as well as his participation in another real estate sale involving and on behalf of limited liability companies. *See* Doc. 299 at 7–9, 11 (the defendants' statement noting that these sales were "performed" by Mr. Brooksby); Doc. 300 at 1 ¶ 2 (declaration of Mr. Brooksby declaring facts in Doc. 299 are true).

Plaintiffs have filed a motion to hold Mr. Brooksby in contempt for these violations of the permanent injunction.[5] Doc. 329.

The plaintiffs also filed a motion asking that James C. Lanik be appointed as receiver of the assets of Mr. Brooksby, The Estates LLC, Avirta LLC, GG Irrevocable Trust, and King Family Enterprises LLC.[6] Doc. 316. These defendants initially opposed the motion, but their brief in opposition contained no citations to the record or case law. Doc. 323. And in open court on November 29, 2022, the defendants withdrew their opposition and consented to the appointment of a receiver. The defendant Carolyn Souther, represented by different counsel, asked at the hearing that a Receiver be appointed to protect assets in which she has in interest.

---

[5] The plaintiffs also asked the Court to hold Mr. Brooksby in contempt for violation of the Charging Order, *see* Doc. 329, but at the hearing on November 29, 2022 they told the Court they were no longer pursuing that avenue and instead wanted to focus on the violations of the permanent injunction.

[6] The motion refers to King Family Holdings, LLC, but that is not a judgment debtor or a defendant. Judgment was entered against King Family Enterprises LLC, *see* Doc. 245, and the evidence with which the Court is familiar concerns King Family Enterprises LLC. *See, e.g.*, Docs. 245–248. The Court assumes the reference to King Family Holdings was a clerical error.

10

## II. Motion for Contempt – Violations of the Permanent Injunction

The plaintiffs have filed a motion to hold Mr. Brooksby in contempt for selling properties in violation of paragraph 9 of the permanent injunction. "To ensure compliance with its orders, a district court has the inherent authority to hold parties in civil contempt." *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)).

Before a court will find a party in civil contempt, the entity seeking the contempt order must establish four things by clear and convincing evidence: "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result." *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (cleaned up) (quoting *Colonial Williamsburg Found. v. The Kittinger Co.*, 792 F. Supp. 1397, 1405–06 (E.D. Va. 1992), *aff'd*, 38 F.3d 133, 136 (4th Cir. 1994)).

Paragraph 9 of the permanent injunction, in effect since June 2, 2022, enjoins Mr. Brooksby and other defendants from acting together, in any combination, or with any other persons or entities to buy or sell directly or indirectly any property obtained through a public real estate foreclosure auction anywhere in the United States for a period of eight years. Doc. 246 at ¶ 9. In other words, the enjoined defendants may buy or sell property individually and on his or her own behalf, but none may buy or sell property through or with any entity, including any LLC.

On July 28, 2022, defendant Carolyn Souther filed a declaration of compliance in which she described how Mr. Brooksby violated this injunction on June 29, 2022. Doc. 277 at ¶¶ 9–15. On or around this date, Mr. Brooksby signed various documents for the sale of real estate ("202 River Bluff") in South Carolina on behalf of Biscay, LLC. Doc. 277-5 at 5–6, 8. This property was bought at a public foreclosure auction, Doc. 277 at ¶ 9, and the closing documents show that Mr. Brooksby acted with another entity, Biscay LLC, to sell this property in violation of the injunction. Doc. 277-5 at 5–6, 8. Mr. Brooksby has admitted his acts in the Biscay sale, as well as his participation in another real estate sale ("2019 Tennessee Avenue") involving and on behalf of limited liability companies. *See* Doc. 299 at 7–9, 11 (the defendants' statement noting that the June sale and another sale were both "performed" by Mr. Brooksby through LLCs); Doc. 300 at 1 ¶ 2 (declaration of Mr. Brooksby declaring facts in Doc. 299 are true); *see also* Doc. 322.

There is some evidence that Mr. Brooksby has violated the injunction through sales of other properties. At least two other properties that had been bought through foreclosure were sold sometime after June 2, 2022, *see* Doc. 322 at 3, and the evidence suggests that Mr. Brooksby played a role in those sales as well. *See, e.g.*, Doc. 299-1 at 6–7 (letter from Mr. Shaw, Mr. Brooksby's counsel, explaining that "Mr. Brooksby handles, directs and controls various aspects of properties acquired through The Estates system" and that he "always" handled transactions and sales of Estates' property).

It is undisputed that the permanent injunction, Doc. 246, was a valid decree issued by this Court, and that Mr. Brooksby had actual knowledge of the injunction. The injunction was in the plaintiffs' favor, as it was designed to prevent the same type of

12

antitrust violations that harmed the plaintiffs. And Mr. Brooksby violated the terms of this injunction through the sales of 202 River Bluff and 2019 Tennessee Avenue, discussed *supra*.

Mr. Brooksby initially contended that he should not be held in contempt because he did not know that his conduct was in violation of the permanent injunction. This argument is frivolous. The injunction itself is clear that Mr. Brooksby could not act with any entity to sell, directly or indirectly, "any property obtained through a public real estate foreclosure auction anywhere in the United States for a period of eight years." Doc. 246 at ¶ 9. The Court further explained in its Memorandum Opinion and Order that the injunction prohibited the defendants from acting with any entity to "sell any property obtained at public foreclosures for the next eight years," but that the defendants could continue to individually participate in the public foreclosure market. Doc. 244 at 28. This is sufficient to provide Mr. Brooksby with "at least constructive knowledge" that his conduct was in violation. *See Ashcraft*, 218 F.3d at 301.

Additionally, "[t]he absence of wilfulness does not relieve from civil contempt." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). Because the purpose of civil contempt is remedial, not punitive, it does not matter "with what intent the defendant did the prohibited act." *Id.* "An act does not cease to be a violation . . . of a decree merely because it may have been done innocently." *Id.* Mr. Brooksby's argument that he did not willfully violate the injunction does not save him from being in contempt.

As stated in open court on November 29, 2022, the Court grants the plaintiffs' motion to hold Mr. Brooksby in civil contempt.

13

At the November 29, 2022, hearing, the plaintiffs essentially withdrew their other contentions as to contempt, in light of the appointment of a Receiver, and for the same reason modified their request for relief, asking only that Mr. Brooksby be ordered to provide copies of the closing documents for the transactions in which he participated in violation of the injunction. This is an appropriate remedy, as it will allow the plaintiffs to begin tracing those assets to determine if they are available to satisfy the judgment. As reflected in the Minute Entry, the Court ordered Mr. Brooksby to provide the plaintiffs with the closing documents for five sales—202 River Bluff, 2019 Tennessee Avenue, 1825 St. Julian Place Unit 17, 15050 Mesquite Trail, and 934 Riverstone—by December 2, 2022. *See* Minute Entry 11/29/2022; Doc. 329 at 1 ¶ 2. Mr. Brooksby filed documents he identified as responsive on December 1, 2022. Doc. 361.

### III. Motion to Appoint a Receiver

The plaintiffs filed a motion asking that James C. Lanik be appointed as receiver of the assets of Mr. Brooksby, The Estates LLC, Avirta LLC, GG Irrevocable Trust, and King Family Enterprises LLC. Doc. 316. They contend that Mr. Brooksby is in control of the other entities and that these entities are liquidating or likely to liquidate their assets, specifically by selling the properties obtained during the bid-rigging scheme, in avoidance of paying the judgment. Doc. 317. The defendants[7] initially opposed the

---

[7] Defendants Souther and NC Bidding-2 are represented by other counsel, *see* Docs. 276, 295, and did not respond to the motion, which is not directed towards them or their assets. At the November 29 hearing, counsel for Ms. Souther joined in the plaintiffs' motion for a receiver. Unless otherwise specified, the Court uses the term "the defendants" in this section to refer to the defendants who are the subject of the motion for a receiver.

14

motion, Doc. 323, but in open court on November 29, 2022, they withdrew this opposition and consented to appointment of a receiver.

A "district court has within its equity power the authority to appoint receivers and to administer receiverships." *Gilchrist v. Gen. Elec. Cap. Corp.*, 262 F.3d 295, 302 (4th Cir. 2001); *see also* Fed. R. Civ. P. 66. Receivers appointed by a federal court "manage and operate" the receivership estate "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b); *accord Gilchrist*, 262 F.3d at 302. Receiverships are granted for numerous reasons, including "[w]hen a judgment creditor seeks to acquire and preserve the assets of the litigation prior to its destruction or demise," and whether to appoint a receiver is subject to the broad discretion of the district court. 13 Moore's Federal Practice – Civil § 66.04.

Neither the Supreme Court nor the Fourth Circuit has provided a concrete list of factors for courts to weigh in considering whether to appoint a receiver. *See Manuel v. Gembala*, No. 10-CV-4, 2010 WL 3860407, at *6 (E.D.N.C. Sept. 30, 2010) ("[T]here is no precise formula for determining whether receivership is appropriate . . . ."). Courts have considered a variety of factors before appointing a receiver. *See, e.g.*, *LNV Corp. v. Harrison Family Bus., LLC*, 132 F. Supp. 3d 683, 689–90 (D. Md. 2015) (collecting cases and summarizing authorities); *Brill & Harrington Invs. v. Vernon Sav. & Loan Ass'n*, 787 F. Supp. 250, 253–54 (D.D.C. 1992). Generally, the following considerations are likely to be relevant:

15

> fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2983 (3d ed. 2022) (cleaned up); *see also* 13 Moore's Federal Practice – Civil § 66.04 (listing factors courts generally consider important when appointing receivers).

The evidence of record supports the inference that Mr. Brooksby and the entities he controls are engaged in a plan to hide their assets and to avoid paying the judgment. Mr. Brooksby, acting with and on behalf of an entity and in direct violation of the permanent injunction, has sold property obtained through public foreclosure auctions on at least two occasions. *See supra* pages 12–13. For at least some of these sales, some of the profits should have been paid toward satisfying the judgment. Yet the record does not show that the Clerk has received any money from any defendant or any entity subject to the charging order towards satisfying the judgment. Neither Mr. Brooksby nor any other defendant has explained what happened to the proceeds of these sales.

The evidence is overwhelming that Mr. Brooksby and the entities he controls or manages plan to sell properties bought through public foreclosure auctions, despite the permanent injunction prohibiting Mr. Brooksby from doing so. The bulk of their entire response to the plaintiffs' motion for a receiver is to explain how these defendants are "willing to work through" (i.e., sell) the properties, "for a fee," pointing to their claimed expertise. Doc. 323 at 1. In other words, Mr. Brooksby initially intended to keep

16

violating the permanent injunction for his own profit and those of his undisclosed "investors." The evidence further shows that at least some of the profits from these sales will be funneled through the defendants, specifically the Estates, Avirta, GG Irrevocable Trust, or King Family Enterprises, eventually making their way to or for the benefit of Mr. Brooksby.

While these defendants through counsel say they will "hand the profits over to the court," *id.*, their conduct to date provides no such assurance. Mr. Brooksby was up front during his deposition that he uses these and other entities to protect his assets. Doc. 172 at 84–87. He paid nothing towards a multi-million dollar verdict entered against him in Nevada some years ago. Doc. 354 at 20, 26–27.

And Mr. Brooksby and his entities are not the best record-keepers. He has been unable to timely comply in full with the Court's supplemental compliance order, *see* Doc. 322 at 1 (Mr. Brooksby's declaration noting that as to blanks in the chart attached to his declaration, "I don't know that formation [sic] at this time"), and the Court's Order compelling him to answer the plaintiffs' post-judgment interrogatories.

The defendants' track record throughout this litigation has been to deny and delay. The involvement of Mr. Brooksby's attorneys provides no assurance that the involvement of counsel will increase the reliability of Mr. Brooksby's record-keeping, as their work has been sloppy at best and potentially complicit at worst.

The plaintiffs have legitimate concerns that few if any of the profits and fees will make their way to the judgment creditors. Once the property has been sold and the proceeds distributed, the plaintiffs' options to trace the money for satisfaction of the

17

judgment become much more complicated, if not impossible. Mr. Brooksby's testimony, Doc. 172, and the public records available on some of the various entities he controls or from which he benefits establish that there is a complex web of transactions and relationships that an outsider will have difficulty untangling. Mr. Brooksby during his deposition and at trial tended conveniently not to "remember" details about his various entities, including their names. *See* Doc. 172 at 18, 22, 31–32, 34–35, 84, 135.[8]

A qualified receiver is in a good position to oversee the properties, keep good records, track down and maintain other assets of the defendants, and make more funds available for satisfaction of the judgment than if the defendants are left in charge. Mr. Lanik is highly qualified to serve as a receiver. He is licensed to practice law in North Carolina, Virginia, and Colorado and a partner at Waldrep Wall Babcock & Bailey PLLC. Doc. 318 at ¶¶ 2–3. He is admitted to practice in the three Federal District Courts in North Carolina and the United States Court of Appeals for the Fourth Circuit, among others. *Id.* at ¶ 3. Mr. Lanik's practice is focused on bankruptcy law, and he is board-certified in business bankruptcy law by the North Carolina State Bar and the American Board of Certification. *Id.* at ¶ 4. He is currently on the panel of Chapter 7 Trustees for this district, and he has served as a court-appointed receiver in state court. *Id.*

The evidence against Mr. Brooksby and the Estates was compelling, as the Court has previously explained here and elsewhere. But in the unlikely event they should prevail on appeal, the assets will be protected by the work of the receiver.

---

[8] No party has yet filed the trial transcript, but the Court remembers Mr. Brooksby's evasive demeanor and convenient forgetfulness during his testimony.

18

Upon full evaluation of the evidence in the entire record and based on the Court's years-long knowledge of this case, the Court finds and concludes that: there is imminent danger that property in which the defendants have a financial interest will be sold and the defendants will conceal or squander the money they are entitled to receive upon sale of those properties rather than turning over those proceeds to satisfy the judgment; that the legal remedies available to the plaintiffs when that happens are non-existent in practical terms; that failure to appoint a receiver is likely to result in substantial harm to the plaintiffs' ability to collect the judgment while appointment of a qualified receiver is unlikely to harm the defendants' financial interests; and that the plaintiffs are highly likely to succeed on appeal as to Mr. Brooksby and the Estates and likely to succeed as to Avirta, GG Irrevocable Trust, and King Family Enterprises.

## IV. Conclusion

Mr. Brooksby violated the permanent injunction by joining with others to sell real estate bought out of foreclosure. He is in contempt of court. He and other defendants are actively engaged in hiding assets and for this and other reasons, and in the absence of an objection, appointment of a receiver is appropriate.

It is **ORDERED** that:

1. Plaintiffs' motion for contempt, Doc. 329, is **GRANTED in part**, and Craig Brooksby is in contempt of court for violations of the permanent injunction by acting with others to sell real property bought out of foreclosure. Otherwise, the motion is **DENIED without prejudice**.

19

2. Mr. Brooksby is **ORDERED** to produce the closing documents for the sales of the 202 River Bluff, 2019 Tennessee Avenue, 1825 St. Julian Place Unit 17, 15050 Mesquite Trail, and 934 Riverstone properties. These closing documents **SHALL** be filed on the public docket no later than December 2, 2022.

3. Plaintiffs' motion for appointment of a receiver, Doc. 316, is **GRANTED**. A separate Order appointing Mr. Lanik has been entered. Doc. 362.

This the 7th day of December, 2022.

_____
UNITED STATES DISTRICT JUDGE